In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1030

RONALD SHELL,

*Plaintiff-Appellee,*

*v.*

BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-11040 — **Sharon Johnson Coleman**, *Judge.*

ARGUED SEPTEMBER 26, 2019 — DECIDED OCTOBER 29, 2019

Before BAUER, MANION, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge*. Burlington Northern Sante Fe Railroad Company refused to hire Ronald Shell solely because it believed his obesity presented an unacceptably high risk that he would develop certain medical conditions that would suddenly incapacitate him on the job. Shell sued BNSF under the Americans with Disabilities Act, alleging that BNSF discriminated against him based on a disability. BNSF moved for summary judgment and argued that the ADA's definition of

"disability" is not met where an employer regards an applicant as not presently having a disability but at high risk of developing one. Concluding that the ADA does reach discrimination based on a future impairment, the district court denied BNSF's motion. We come to a contrary conclusion and reverse.

**I**

Ronald Shell began working at Chicago's Corwith Rail Yard in 1977. The Corwith Yard is a hub at which freight containers are loaded on and off trains before continuing the journey to their intended destinations. Shell occupied different positions over his 33 years at the railyard, including as a groundsman, driver, and crane operator. All indications are that Shell was a productive and skilled employee.

By 2010, Burlington Northern Santa Fe Railway Company owned Corwith Yard, and Shell worked for the company that BNSF contracted with to handle its operations. Later that year, BNSF decided to assume the railyard's operations itself. This ended the employment of those like Shell who worked for the operations company, but BNSF invited those employees to apply for new positions.

Shell applied to work as an intermodal equipment operator. The position required the employee to perform three roles—that of a groundsman, who climbs on railcars to insert and remove devices that interlock the containers; a hostler, who drives the trucks that move trailers; and a crane operator, who operates the cranes used to load and unload containers. BNSF classifies this as a "safety-sensitive" position because it requires working on and around heavy equipment. Upon reviewing Shell's application, BNSF extended a conditional

offer of employment. One of the conditions was that Shell pass a medical evaluation.

Dr. Michael Jarrad, BNSF's chief medical officer, was responsible for making the decision. Dr. Jarrad reviewed a medical history questionnaire, in which Shell described his overall health as very good and did not report any medical conditions. A physical exam then revealed that Shell was 5′ 10′′ tall and weighed 331 pounds, translating to a body-mass index of 47.5.

BNSF does not hire applicants for safety-sensitive positions, like the one Shell was applying for, if their BMI is 40 or greater. People with BMIs in this range are considered to have class III obesity. BNSF says that the reasoning behind its BMI policy is that prospective employees with class III obesity are at a substantially higher risk of developing certain conditions like sleep apnea, diabetes, and heart disease and the unpredictable onset of those conditions can result in sudden incapacitation. BNSF believes that someone with class III obesity could unexpectedly experience a debilitating health episode and lose consciousness at any moment, including while operating dangerous equipment—a result that could be disastrous for everyone in the vicinity.

Applying BNSF's BMI policy, Dr. Jarrad decided that Shell was not medically qualified for the job. BNSF informed Shell of his disqualification but told him that his application could be reconsidered if he lost at least 10% of his weight, maintained the weight loss for at least six months, and submitted to further medical evaluations if requested.

Shell sued BNSF, alleging that its refusal to hire him constituted discrimination on the basis of a perceived disability

in violation of the ADA. BNSF moved for summary judgment after the close of discovery. The company argued that Shell did not have a disability within the meaning of the ADA because his obesity was not a qualifying impairment and no evidence suggested that BNSF regarded him as presently having such an impairment. In the alternative, BNSF asserted that even if its refusal to hire Shell reflected discrimination, its BMI policy fit within the ADA's business-necessity defense.

The district court denied BNSF's motion, holding that Shell's obesity was not a qualifying impairment but that a disputed factual question remained—whether BNSF regarded Shell as having the allegedly obesity-related conditions of sleep apnea, heart disease, and diabetes. The district court also declined to grant BNSF summary judgment based on the business-necessity defense because the company had not provided sufficient evidence to show that class III obesity posed risks great enough to make the policy necessary.

At BNSF's request, the district court certified its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). In doing so, the district court defined the question presented as "whether the ADA's regarded-as provision encompasses conduct motivated by the likelihood that an employee will develop a future disability within the scope of the ADA." We accepted the interlocutory appeal and invited the EEOC to file a friend-of-the-court brief, which the agency then did.

**II**

The ADA generally prohibits covered employers from discriminating against job applicants "on the basis of disability." 42 U.S.C. § 12112(a). To prove a violation of this provision, a plaintiff must show "(1) he is disabled; (2) he is otherwise

qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability." *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016). The statute defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). Paragraph (3), in turn, explains that someone is "being regarded as having such an impairment" when "he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A).

At the time this case was before the district court, Shell had an argument that his obesity qualifies as a physical impairment and thus a "disability" within the meaning of § 12101(1)(A). If that were true, the undisputed facts would support a prima facie case of discrimination because Shell's weight motivated BNSF's decision not to hire him. But our recent decision in *Richardson v. Chicago Transit Authority*, 926 F.3d 881 (7th Cir. 2019) foreclosed that argument for Shell. We held that obesity alone is not a physical impairment under the ADA unless accompanied by evidence that the obesity is caused by an underlying physiological disorder or condition, *id*. at 888, and Shell presented no such evidence to the district court. Nor does Shell point to any evidence that BNSF regarded his obesity as having a physiological origin.

Shell instead bases his disability claim on those medical conditions that BNSF feared he would develop—sleep apnea, diabetes, and heart disease—which undisputedly qualify as

impairments under the statute. The wrinkle, though, is that he did not have those impairments at the time he applied to work for BNSF, and the company held no perception to the contrary.

Shell spends much of his brief arguing that by refusing to hire him based on the risk of future impairment, BNSF has treated him as if he has the impairments now. That position relies on an assumption that even if BNSF knew that Shell did not currently have the impairments, treating him as if he did would constitute a disability. That view is mistaken. See *Silk v. Bd. of Trs., Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 706 (7th Cir. 2015) ("In satisfying the 'regarded as' prong, Silk must show that the College perceived him as having an impairment."). The evidence is clear that BNSF did not believe that Shell had any of the feared impairments when it refused his application. Dr. Jarrad submitted a declaration saying that when he made his decision, he did not understand Shell to have one of those impairments. And when BNSF echoed the same in its statement of material facts, Shell's response pointed to no evidence to controvert that fact.

All of this narrows and lends precision to the question before us: whether the ADA's "regarded as" prong covers a situation where an employer views an applicant as at risk for developing a qualifying impairment in the future. We hold that it does not.

A

We find our answer in the first (and usually final) stop for statutory questions—the text. The ADA's "regarded as" prong defines "disability" as "being regarded as having [a physical or mental] impairment." 42 U.S.C. § 12102(1)(C). It is

written in the passive voice, resulting in some of the attendant clumsiness that English teachers warn of. Even so, the text plainly encompasses only current impairments, not future ones. The key word is "having," and the EEOC and BNSF quarrel over whether it is a gerund or a present participle. Labels aside, no one would understand the sentence, "Shell is being regarded as having sleep apnea," to mean anything other than Shell is viewed today as currently suffering from sleep apnea. "Having" means presently and continuously. It does not include something in the past that has ended or something yet to come. To settle the technical debate, it is a present participle, used to form a progressive tense. See BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE 1020 (4th ed. 2016) (defining "present participle" as "[a] nonfinite verb form ending in -ing and used in verb phrases to signal the progressive aspect").

This reading is definitively reinforced by the ADA's specific definition of "being regarded as having such an impairment" in paragraph 3, which is when "he or she has been subjected to an action … because of an actual or perceived physical or mental impairment." 42 U.S.C. § 12102(3)(A). If the impairment does not yet exist, it can be neither actual nor perceived.

The EEOC points to the Dictionary Act's command that "unless the context indicates otherwise … words used in the present tense include the future as well as the present." 1 U.S.C. § 1. The Dictionary Act adds little, however, because its general instruction cannot overcome the plain meaning of the ADA's statutory text. Put another way, the "context [that] indicates otherwise" here comes from the ordinary import of the language Congress employed in § 12102(1)(C) and

§ 12102(3)(A) of the ADA. See *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199 (1993) ("'Context' here means the text of the Act of Congress surrounding the word at issue … and this is simply an instance of the word's ordinary meaning."); *EEOC v. STME, LLC*, 938 F.3d 1305, 1317 (11th Cir. 2019) ("While it is true that the phrase 'being regarded as having such an impairment' contains present tense verbs, the ADA's plain language and context indicates that the Dictionary Act does not apply here as the EEOC suggests.").

We find ourselves in good company with this reading of the ADA's text. In *Morriss v. BNSF Railway Company*, 817 F.3d 1104, 1113 (8th Cir. 2016), the Eighth Circuit came to the same conclusion on similar facts. BNSF denied Melvin Morriss's job application for the same reason it denied Shell's—his BMI was over 40. *Id*. at 1106. Morriss, like Shell, argued that BNSF's refusal to hire him based on the risk that he would develop certain medical conditions in the future meant that the company perceived him as having a current physical impairment. *Id*. at 1113. The Eighth Circuit explained that "the plain language of the ADA prohibits actions based on an existing impairment or the perception of an existing impairment" but "[t]he ADA does not prohibit discrimination based on a perception that a physical characteristic—as opposed to a physical impairment—may eventually lead to a physical impairment as defined under the Act." *Id*.

All other circuits that have confronted the issue agree. See *STME*, 938 F.3d at 1315 ("[T]he disability definition in the ADA does not cover this case where an employer perceives a person to be presently healthy with only a potential to become ill and disabled in the future."); *EEOC v. BNSF Ry. Co.*, 902

F.3d 916, 923 (9th Cir. 2018) (noting that the parties agreed "BNSF must have regarded [the employee] as having a *current* impairment," a reading that "comports … with the statutory text, which prohibits discrimination on the basis of an 'actual or perceived impairment' in the present tense"); see also *Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016) (stating that the employer must have "perceived the impairment at the time of the alleged discriminatory action").

With only proof that BNSF refused to hire him because of a fear that he would one day develop an impairment, Shell has not established that the company regarded him as having a disability or that he is otherwise disabled. Absent this showing, he cannot prevail on his claim of discrimination, and BNSF is entitled to summary judgment.

B

The EEOC advances two other arguments in favor of its contrary reading of the ADA's text. First, the agency points to its Compliance Manual, which provides this example:

> CP's genetic profile reveals an increased susceptibility to colon cancer. CP is currently asymptomatic and may never in fact develop colon cancer. After making CP a conditional offer of employment, R learns about CP's increased susceptibility to colon cancer. R then withdraws the job offer because of concerns about matters such as CP's productivity, insurance costs, and attendance. R is treating CP as having an impairment that substantially limits a major life activity. Accordingly, CP is covered by the third part of the definition of "disability."

EEOC Compl. Man. § 902.8, 2009 WL 4782113. Though at first blush this example seems to support the agency's contention that future impairments are covered, other agency guidance muddies the water. Foremost, the EEOC's Interpretative Guidance says the definition of "impairment" does not include "characteristic predisposition to illness or disease." 29 C.F.R. Pt. 1630, App. § 1630.2(h). If the impairment is susceptibility to colon cancer, then the Compliance Manual contradicts the Interpretive Guidance's statement that a predisposition is not an impairment. And if the impairment is colon cancer itself, the Compliance Manual contains no explanation for why the withdrawal of a job offer based on the applicant's susceptibility to colon cancer is the same thing as treating him as if he now has colon cancer. The Compliance Manual's genetic profiling example is unmoored from the ADA's text and in tension with other EEOC interpretative guidance, so it lacks the power to persuade us away from the statute's unambiguous text.

Second, the EEOC invokes the ADA's purpose, part of which is to combat "society's accumulated myths and fears about disability and disease." *Sch. Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 284 (1987). But to the extent BNSF's BMI policy reflects a stereotype, it is one about obesity, and Shell's obesity—lacking evidence of a physiological cause—is not a disability that the ADA protects. See *Richardson*, 926 F.3d at 888. While Congress did direct that "[t]he definition of disability … shall be construed in favor of broad coverage of individuals," 42 U.S.C. § 12102(4)(A), the mandate does not give us license to go beyond the terms of the statute. See *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 543 (2019) ("If courts felt free to pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal, we would risk failing to 'take

account' of legislative compromises essential to a law's passage and, in that way, thwart rather than honor 'the effectuation of congressional intent.'"). We cannot decide the question presented based on broad statutory purposes where the answer is supplied by the statute's plain language.

For these reasons, we REVERSE the district court's denial of summary judgment and REMAND for further proceedings.