[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14814

_____

WESTCHESTER GENERAL HOSPITAL, INC.,

Plaintiff-Appellee,

*versus*

EVANSTON INSURANCE COMPANY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-22831-KMW

_____

Before JORDAN, JILL PRYOR, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

This diversity case requires us to interpret a quirky insurance policy. The Defendant, Evanston Insurance Company ("Evanston"), appeals the district court's grant of summary judgment in favor of Plaintiff Westchester General Hospital, Inc. ("Westchester"), challenging the district court's holding that Evanston must defend Westchester in its ongoing litigation against Jane and John Doe (the "Does"). After the Does sued Westchester for negligence based on a violent incident that occurred at Westchester's facility, Westchester sought coverage from Evanston, its insurer, under Westchester's "Specified Medical Professions Insurance Policy" ("the Policy"). Evanston refused to provide complete coverage. So, Westchester sued Evanston, seeking a declaratory judgment that Evanston must defend it in its ongoing litigation against the Does. After the case was removed to federal court, a district court judge in the Southern District of Florida granted partial summary judgment in favor of Westchester, and Evanston appealed.

The district court's grant of summary judgment in favor of Westchester was proper because none of the relevant exclusions invoked by Evanston bars coverage for the Does' claims against Westchester. Accordingly, we affirm.

## I.

The story of this seemingly mundane insurance dispute begins with a violent act. On December 31, 2018, Jane Doe was a

patient at Westchester's mental health facility in Miami-Dade County.  While asleep and medicated, Doe was allegedly sexually assaulted and raped by Fernando Felix Ramos-Garcia ("Ramos-Garcia"), who was employed by Westchester at the time of the incident.  The Does sued Westchester and Ramos-Garcia in Miami-Dade County circuit court, claiming that Westchester was negligent for failing to adequately investigate, train, and supervise its staff.

Westchester's insurance policy, issued by Evanston, provides insurance coverage for Westchester's defense against a third party's legal claims.  The Policy has two parts: (1) the Professional Liability Insurance Policy ("PL Coverage Part"), which is not relevant to this case, and (2) the General Liability Insurance Policy ("GL Coverage Part"), which is.  The GL Coverage Part is a wide-ranging policy that provides Westchester with the following coverage for bodily injury and property damage liability:

> [Evanston] shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company . . . for Bodily Injury or Property Damage caused by an Occurrence[.]

DE 31-1 at 27.

The Policy also contains an Umbrella Policy, which provides excess indemnity coverage if either the PL Coverage Part or the GL Coverage Part applies.

The GL Coverage Part has several exclusions to coverage. Two of them are relevant for our purposes: the Professional Services Exclusion and the Bodily Injury Exclusion. The Professional Services Exclusion excludes any claim:

> [b]ased upon, arising out of, or in any way involving an act, error or omission in the performance of services of a professional nature rendered or that should have been rendered by the Insured or by any person or organization for whose acts, errors or omissions the Insured is legally responsible[.]

DE 31-1 at 33.

The critical phrase "services of a professional nature" is not defined anywhere else in the Policy, though the similar term "Professional Services" is defined as encompassing ten broad categories, which are listed in the Hospital Amendatory Endorsement Aggregate Policy Limit ("Hospital Endorsement"). These are the categories:

> 1. Medical, surgical, dental, x-ray, nursing, mental health services or treatments;
> 2. The furnishing of food, beverages, drugs or medical, dental or surgical supplies or appliances in connection with the services stated in subparagraph I.1. hereinabove;
> 3. The handling or performing of post-mortem

examination or organ donation or harvesting on dead human bodies;

4. Health or therapeutic services, treatments, advice or instructions;

5. Medical or mental health counseling services, social services or other such treatments;

6. Furnishing or dispensing of pharmacotherapeutic agents, including chemical and biological products or medical, dental or surgical appliances or equipment;

7. Services in connection with a Clinical Trial;

8. Supervising, teaching or proctoring services rendered by a natural person at the Named Insured's request;

9. Services rendered by an Insured as a member of a formal accreditation or similar professional board or committee of the Named Insured; or

10. The execution or failure to execute a decision or directive of a formal accreditation or similar professional board or committee of the Named Insured.

DE 31-1 at 83.

While the Professional Services Exclusion bars coverage for claims arising out of acts involving the performance of "services of a professional nature," the Bodily Injury Exclusion bars coverage for claims that are:

[b]ased upon or arising out of Bodily Injury sustained by any patient, person or resident of a facility

> receiving services of a professional nature or any such
> Claim brought by or on behalf of the spouse, child,
> parent, grandparent, brother, sister or partner of such
> patient, person or resident of a facility.

DE 31-1 at 36.

After the Does filed their complaint against Westchester, Westchester promptly notified Evanston of the existence and nature of the Does' lawsuit. At the time of the alleged sexual assault, the Policy and the Umbrella Policy were in effect. Evanston issued a reservation of rights letter to Westchester on April 2, 2019, explaining that it would provide a defense to Westchester under the PL Coverage Part, but refusing to defend Westchester under any other parts of the Policy or to indemnify Westchester for any potential judgment entered against it.

Westchester sued Evanston in the Eleventh Judicial Circuit in and for Miami-Dade County on May 29, 2019, seeking a declaratory judgment that Evanston owed a duty to defend Westchester in the Does' lawsuit under the GL Coverage Part of the policy. Evanston removed the action to federal court in the Southern District of Florida on July 10, 2019. Thereafter, the parties moved for summary judgment, disputing whether the Professional Services Exclusion and the Bodily Injury Exclusion of the GL Coverage Part barred coverage. In an Omnibus Report & Recommendation ("R&R"), the magistrate judge determined that Westchester was covered under the GL Coverage Part and the Umbrella Policy,

rejecting Evanston's argument that the Professional Services Exclusion and the Bodily Injury Exclusion barred coverage.

The district court adopted the R&R in full. The parties then jointly moved for partial final judgment under Federal Rule of Civil Procedure 54(b), and the district court granted the motion. Final judgment was entered in favor of Westchester as to the GL Coverage Part and Umbrella Policy and in favor of Evanston as to the PL Coverage Part. Evanston appealed, challenging only whether the district court erred in concluding that Evanston owed Westchester a duty to defend under the GL Coverage Part and the Umbrella Policy. *See Lloyd Noland Found., Inc. v. Tenet Health Care Corp.*, 483 F.3d 773, 777 (11th Cir. 2007) (noting that "appellate jurisdiction lies when the district court properly certifies as 'final,' under Rule 54(b), a judgment on fewer than all claims").

## II.

## A.

We review a district court's rulings on motions for summary judgment *de novo*. *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012). In doing so, we apply "the same legal standards as the district court and view[] all facts and reasonable inferences in the light most favorable to the nonmoving party." *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1203 (11th Cir. 2001). Moreover, the interpretation of an insurance contract is a strict question of law and also is subject

to *de novo* review.  *Elan Pharm. Rsch. Corp. v. Emps. Ins. of Wausau*, 144 F.3d 1372, 1375 (11th Cir. 1998).

Let's start with the basics.  Since our jurisdiction is grounded in diversity, we apply Florida's substantive law.  *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938); *Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1357 (11th Cir. 2014).  In Florida, insurance contracts "are construed according to their plain meaning."  *Garcia v. Fed. Ins. Co.*, 473 F.3d 1131, 1135 (11th Cir. 2006) (quotation marks omitted) (quoting *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005)).  When interpreting these contracts, Florida's courts read all the policy provisions in tandem to find the most reasonable and probable interpretation.  *Gilmore v. St. Paul Fire & Marine Ins.*, 708 So. 2d 679, 680 (1st Fla. DCA 1998).  Because "insurance coverage must be [interpreted] broadly and its exclusions narrowly[,]" *Hudson v. Prudential Prop. & Cas. Ins. Co.*, 450 So. 2d 565, 568 (2nd Fla. DCA 1984), ambiguities are construed against the insurer and in favor of coverage -- so long as the provision at issue is ambiguous.  *Taurus Holdings*, 913 So. 2d at 532.

An insurer's duty to defend an insured in a legal action under Florida law "arises when the complaint alleges facts that fairly and potentially bring the suit within policy coverage." *Jones v. Fla. Ins. Guar. Ass'n*, 908 So. 2d 435, 442–43 (Fla. 2005).  Even if the allegations in the complaint are meritless, the duty to defend nonetheless arises; all doubts about whether the duty to defend applies are resolved in favor of the insured. *Id.* at 443.  However, an insurer does not need to defend an insured if a policy exclusion applies. *Keen v.*

*Fla. Sheriffs' Self-Ins. Fund*, 962 So. 2d 1021, 1024 (4th Fla. DCA 2007).  Finally, the insured has the initial burden to establish that a policy coverage applies, but then "the burden shifts to the insurer to prove that the loss arose from a cause which is excepted." *Hudson*, 450 So. 2d at 568.

Both parties agree on two things: (1) the GL Coverage Part applies here if neither the Professional Services Exclusion nor the Bodily Injury Exclusion applies; and (2) the Umbrella Policy applies if the GL Coverage Part applies.  The case boils down to whether either of the exclusions in the GL Coverage Part applies.

## B.

As a starting point, Evanston argues that the Professional Services Exclusion to the GL Coverage Part bars coverage of the Does' claims against Westchester for two reasons.  First, Evanston says that the scope of the Professional Services Exclusion is extremely broad, and it forecloses any claim that is even tenuously related to a professional service because it prevents coverage for any claim that is "[b]ased upon, arising out of, or in any way involving an act, error or omission in the performance of services of a professional nature."  Second, Evanston argues that "services of a professional nature," a term that is not defined in the Policy, is different from "Professional Services," which the Hospital Endorsement defines as incorporating ten broad categories.  Because "Professional Services" is written with a capitalized "P" and "S," and "Professional Services" is not *literally* the same phrase as "services of a professional nature," Evanston reasons that the two phrases

must carry different meanings.  So, since Jane Doe was sexually assaulted where she was being treated, Evanston claims that the Does' allegations at least tenuously relate to the provision of "services of a professional nature."

We are not persuaded by Evanston's argument.  We do, however, agree with Evanston that the "in any way involving" language is extremely broad in scope, and it indicates that the provision applies to any claim even remotely involving "services of a professional nature." *See HR Acquisition I Corp. v. Twin City Fire Ins. Co.*, 547 F.3d 1309, 1316 (11th Cir. 2008) (emphasis omitted) (concluding that "in any way related to" is "very broad" and is a "low standard" to meet); *Mergenet Sols., Inc. v. Carolina Cas. Ins. Co.*, 56 So. 3d 63, 64 (4th Fla. DCA 2011) (similar).  We also agree with Evanston that the district court inaccurately viewed "services of a professional nature" and "Professional Services" as identical terms.  Although similar, the terms are not literally the same.  In fact, if we construed "services of a professional nature," which is not defined in the Policy, to exactly mean "Professional Services," we would not be "giv[ing] every provision its full meaning and operative effect." *See Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000); *see also Hunter v. Mocksville*, 897 F.3d 538, 552 (4th Cir. 2018) (emphases in original) ("[W]e must reject any construction of the contract that defines *different* terms in the *same* manner, unless the contract [says so.]").

But that is where Evanston's convincing arguments end.  For one thing, even if Evanston need only show a tenuous

relationship between the claims leveled against Westchester and "services of a professional nature," *some* relationship between the two must exist for the Policy provision not to be rendered illusory. *See Purrelli v. State Farm Fire & Cas. Co.*, 698 So. 2d 618, 620 (2nd Fla. DCA 1997) ("When limitations or exclusions completely contradict the insuring provisions, insurance coverage becomes illusory.").

Evanston's argument that "services of a professional nature" and "Professional Services" carry different meanings doesn't help it either. Since a policy's terms "should be taken and understood in their ordinary sense," *see Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 736 (Fla. 2002) (quotation marks and citation omitted), we must interpret "services of a professional nature" according to its "plain and ordinary meaning," *see Gov't Emps. Ins. Co. v. Macedo*, 228 So. 3d 1111, 1113 (Fla. 2017) (quotation marks and citation omitted). To determine the provision's ordinary meaning, we begin with the dictionary definitions of the words "professional," "services," and "nature." A "professional" is "[s]omeone who belongs to a learned profession or whose occupation requires a high level of training and proficiency." *Professional*, BLACK'S LAW DICTIONARY (11th ed. 2019). "Service" has many meanings, but in this case, based upon context, it means "the performance of some useful act or series of acts for the benefit of another, usu[ally] for a fee." *Service*, BLACK'S LAW DICTIONARY (11th ed. 2019). "In this sense, *service* denotes an intangible commodity in the form of human effort, such as labor, skill, or advice." *Id.* (emphasis in

original).  Finally, "nature" is "[a] fundamental quality that distinguishes one thing from another; the essence of something."  *Nature*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Thus, we interpret "services of a professional nature" to mean *the performance of acts -- which fundamentally require a high level of training and proficiency -- for the benefit of another*.  This interpretation follows the common-sense, ordinary meaning of "services of a professional nature," while also creating a meaning that is still broader than the ten categories of "Professional Services" specified in the Hospital Endorsement above, which are primarily definitionally limited to the provision of *medical* services.

This interpretation is consistent with Florida case law interpreting the meaning of the phrase "professional services" and related terminology.  Florida's courts have consistently interpreted the term "professional services" to mean those types of services that require specialized training.  *See, e.g.*, *Aerothrust Corp. v. Granada Ins. Co.*, 904 So. 2d 470, 472 (3d Fla. DCA 2005) (explaining that "the services which are meant to be excluded as professional are those which require specialized training").

Florida's Third District Court of Appeal, in an insurance case, *Lindheimer v. St. Paul Fire & Marine Insurance Company*, has explained the meaning of the term "professional services" and similar phrases within the context of an insurance policy, whether the term is found in an exclusion or in the main conditions for coverage:

20-14814                Opinion of the Court                13

> [T]he fact that an act occurred in a professional's of-
> fice does not automatically transmute the act into a
> professional service. The location of an act's occur-
> rence is not determinative of liability. There must be
> *some causal connection* between an act and the na-
> ture of the doctor-patient relationship[.]

643 So. 2d 636, 638 (3rd Fla. DCA 1994) (emphasis added).[1]

In *Lindheimer*, the court considered whether a dentist's in-
surance policy for claims that result from "[p]rofessional services
that [the dentist] provided or should have provided" applied to a
claim involving sexual assault. *Id.* at 638. Specifically, the dentist's
patient alleged that the dentist sexually assaulted her after giving
her anesthesia for her periodontal treatment. *Id.* at 637. Even
though the dentist used drugs to facilitate the sexual assault, the
Third District reasoned that the administration of drugs did "not
bring the sexual assault within the course of the medical treatment
provided because the act causing the injury was the assault, not the
use of the drugs." *Id.* at 639. Because the insurance policy provided
coverage for claims that "'arise out of the profession,' or 'result
from professional services,'" the court denied coverage after find-
ing no causal connection between the sexual assault and the provi-
sion of professional services. *Id.* at 638–39.

---

[1] Since the Florida Supreme Court has not ruled on this issue, decisions drawn
from Florida's intermediate appellate courts control, absent some reason to
believe that the Florida Supreme Court would rule otherwise. *See Blanchard
v. State Farm Mut. Auto. Ins. Co.*, 903 F.2d 1398, 1399 (11th Cir. 1990).

Applying *Lindheimer* to the facts in this case, we readily conclude that for an "act" to "in any way involv[e] . . . services of a professional nature," the act must have some causal connection to the professional service. Doe's claims against Westchester stem from Westchester's purported negligence in hiring, training, supervising, and following policies and procedures to protect its patients, but underlying those claims is Jane Doe's alleged sexual assault. As a result, the "act" implicating the Professional Services Exclusion could be the alleged sexual assault or Westchester's purported negligence. Either way, Westchester wins.

If we define the "act" as the alleged sexual assault, the reasoning in *Lindheimer* forecloses any argument that the sexual assault here involves the provision of services of a professional nature. Ramos-Garcia was not treating Jane Doe at the time of the assault as a medical physician or a nurse; neither party has identified any medical services that he was performing at that time. But even if Ramos-Garcia had been Doe's treating physician, "the act causing the injury was the assault, not the [provision of treatment]." *See Lindheimer*, 643 So. 2d at 639; *cf. State Farm Fla. Ins. Co. v. Campbell*, 998 So. 2d 1151, 1154–55 (5th Fla. DCA 2008) (emphasis added) (applying a professional services exclusion when a patient fell while being positioned for an x-ray, because "[t]o be excluded, the act or service must be a medical act, not one that requires no professional skill," and positioning the plaintiff was a medical act "*integral or causally related* to the treatment provided to the patient").

Alternatively, we could construe the "act" in question as Westchester's purported negligence in hiring, training, and supervising its employees, and its failure to adhere to its internal policies and procedures. Indeed, the Does' underlying state court suit against Westchester asserts the claim that Westchester negligently failed to reasonably train, control, or supervise its staff. However, those activities do not fundamentally involve "services of a professional nature." They are administrative and human resource–related functions of the hospital, performed not in its role as a provider of medical treatment, but in its role as an employer and a business. As an illustration, restaurants, grocery stores, and gyms -- entities that do not necessarily provide services requiring high levels of professional training and proficiency -- can still be held liable for failing to properly train or supervise employees that have committed intentional torts against their patrons. Westchester's alleged failure to properly hire, train, or supervise employees is not inherently related to its provision of professional services.

Evanston claims, however, that *Lindheimer* is distinguishable because that case did not involve a general liability policy or a policy exclusion, nor did it define the term "[p]rofessional services." Putting aside the fact that the Policy here *does not* define "services of a professional nature" either, Evanston offers no reason why the lack of a general liability policy or a bodily injury exclusion in *Lindheimer* somehow distinguishes that case from this one. Indeed, the fact that we are interpreting an exclusion here militates *in favor of* a narrower interpretation of the Professional

Services Exclusion. *See Flores v. Allstate Ins. Co.*, 819 So. 2d 740, 744 (Fla. 2002) ("Policy provisions that tend to limit or avoid liability are interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy[.]"); *see also Estate of Tinervin v. Nationwide Mut. Ins. Co.*, 23 So. 3d 1232, 1236 (4th Fla. DCA 2009) ("Exclusionary clauses are strictly construed.").

Evanston also relies on a district court order that this Court affirmed in an unpublished opinion, but its reliance is misplaced. *See Maryland Cas. Co. v. Fla. Atlantic Orthopedics, P.L.*, 771 F. Supp. 2d 1328 (S.D. Fla. 2011), *aff'd*, 469 F. App'x 722 (11th Cir. 2012). For starters, that case has no precedential value. Moreover, the district court in that case applied the professional services exclusion in a general liability policy to claims of negligence because the claims arose out of a clinic's failure to put in place appropriate procedures for emergency medical situations. *Maryland Casualty Company*, 771 F. Supp. 2d at 1333–34. Because the claims of negligence in the clinic's hiring of its medical staff related to the clinic's failure to properly train its medical staff members to handle emergency medical situations, there was a clear causal connection between the plaintiff's claims of negligence in supervising its medical staff and the provision of medical services. *See id.* In contrast, we can discern no causal connection between Westchester's rendition of professional services for its patients, and either Ramos-Garcia's alleged sexual assault or Westchester's allegedly negligent practices in hiring, training, and supervising its non-medical staff.

At bottom, Westchester's provision of professional services in no way relates to Doe's alleged sexual assault or Westchester's oversight of its employee's alleged criminal conduct.  The Professional Services Exclusion to the GL Coverage Part of the Policy does not apply here.

## C.

Next up is the Bodily Injury Exclusion.  To our eyes, no Florida court has interpreted policy language identical to -- or even similar to -- the language in the Bodily Injury Exclusion.  Its interpretation poses an issue of first impression.

Under Evanston's desired reading, "receiving services of a professional nature" is a relative clause[2] that modifies "patient, person or resident of a facility."  That would render the text as follows:

> [B]ased upon or arising out of Bodily Injury sustained by any patient, person or resident of a facility [*who is*] receiving services of a professional nature or any such Claim brought by or on behalf of the spouse, child, parent, grandparent, brother, sister or partner of such patient, person or resident of a facility.

---

[2] A relative clause is "an adjective clause introduced by a relative pronoun expressed or suppressed, relative adjective, or relative adverb and having either a purely descriptive force (as in *John, who often tells fibs*) or a limiting one (as in *boys who tell fibs*)." *Relative Clause*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/relative%20clause (last visited Aug. 18, 2022) (emphasis in original).

Evanston says that its addition of the phrase "who is" purportedly helps explain which types of patients, persons, or residents are excluded from coverage under the GL Coverage Part: namely, those patients whose general purpose for being in the hospital is "receiving services of a professional nature." Under this reading, "receiving services of a professional nature" modifies only "patient, person or resident of a facility," without clarifying *how* the claimant suffered her Bodily Injury.

Westchester's view of the exclusion, however, would read this way:

> [B]ased upon or arising out of Bodily Injury sustained by any patient, person or resident of a facility [*while*] receiving services of a professional nature or any such Claim brought by or on behalf of the spouse, child, parent, grandparent, brother, sister or partner of such patient, person or resident of a facility.

The word "while" that Westchester introduces to the Bodily Injury Exclusion's text clarifies that the claimant's Bodily Injury must occur *at the same time that* the patient is "receiving services of a professional nature." This construction would mean that the Bodily Injury Exclusion does not apply to the Does' claims because Jane Doe was not receiving medical services when, while asleep, she allegedly suffered her "Bodily Injury." Because of the definitional differences between the language at issue in this case and the operative language in *Lindheimer*, the word "while" inserted here does not create a causal connection requirement between "Bodily

20-14814                Opinion of the Court                    19

Injury" and "services of a professional nature." When used as a conjunction, "while" means "during the time that" or "as long as." *While*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/while (last visited Aug. 18, 2022). This means that the Bodily Injury Exclusion applies whenever a "patient, person or resident of a facility" suffers a "Bodily Injury" *during the time that* she is "receiving services of a professional nature."

Westchester offers the better interpretation. First and foremost, the fact that this portion of the Bodily Injury Exclusion is "reasonably or fairly susceptible to different constructions" renders it ambiguous. *See Friedman v. Va. Metal Prods. Corp.*, 56 So. 2d 515, 517 (Fla. 1952). Florida law requires ambiguities and exclusions to be construed against the insurer -- particularly when there are ambiguities within an exclusion. *See Anderson*, 756 So. 2d at 34 (citation omitted) ("[A]mbiguous insurance policy exclusions are construed against the drafter and in favor of the insured. In fact, exclusionary clauses are construed even more strictly against the insurer than coverage clauses."). Considering that this case concerns an ambiguous exclusion to an insurance policy, this combination alone militates against Evanston's proffered interpretation. *See Campbell*, 998 So. 2d at 1153 ("[P]rovisions limiting or avoiding liability are interpreted liberally in favor of the insured and strictly against the insurer.").

Second, the fact that the Bodily Injury Exclusion uses a present participle ("*receiving* services of a professional nature"), as opposed to a traditional relative clause that uses "who" or "that" to

describe a noun (e.g., "[who] *receiv[es]* professional services"), further shows that introducing the word "while" in between "facility" and "receiving" would better accomplish the intent of the parties. A present participle is used to signal present and continuing action. *See Present Participle*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/present%20participle (last visited Aug. 18, 2022) (defining "present participle" as "a participle that typically expresses present action in relation to the time expressed by the finite verb in its clause and that in English is formed with the suffix *-ing* and is used in the formation of the progressive tenses"); *see also Shell v. Burlington N. Santa Fe Ry. Co.*, 941 F.3d 331, 336 (7th Cir. 2019) (explaining that a present participle, such as the word "having," means "presently and continuously," and "does not include something in the past that has ended or something yet to come"). Similarly, the Bodily Injury Exclusion would apply to only those patients who sustain a "Bodily Injury" contemporaneously with their receipt of "services of a professional nature." Because Jane Doe was not "presently and continuously" receiving medical treatment when she was assaulted, the plain text and grammatical rules -- especially when construed against Evanston, the drafter of this exclusion -- yield the conclusion that the Bodily Injury Exclusion does not bar coverage.

In sum, neither the Bodily Injury Exclusion nor the Professional Services Exclusion bars coverage for Westchester's lawsuit against the Does. Evanston owes Westchester a duty to defend the hospital in its litigation against the Does under the GL Coverage

20-14814               Opinion of the Court                 21

Part.  And because we conclude that Evanston owes Westchester a duty to defend under the GL Coverage Part, we hold that the Umbrella Policy also applies.

The district court correctly entered summary judgment for Westchester.

**AFFIRMED**.