LAGOA, Judge.
 

 Medley Warehouses, LC (“Medley”) appeals from a final summary judgment entered in favor of the defendant, Scottsdale Insurance Co. (“Scottsdale”). Because a broker’s agency authority ends when a policy is issued, we reverse the trial court’s entry of final summary judgment in favor of Scottsdale.
 

 I.
 
 FACTUAL AND PROCEDURAL HISTORY
 

 Medley is a limited liability company that owns warehouses located at 10049-10300 N.W. South River Drive, Medley. Carlos Gonzalez (“Gonzalez”) was an employee of Medley, and was responsible for purchasing and maintaining insurance coverage for Medley’s properties. Medley always purchased property and windstorm
 
 *442
 
 insurance which provided replacement cost coverage.
 

 In late 2004, Medley sought property and windstorm coverage to replace an existing policy that was about to expire on January 10, 2005. To that end, Medley contacted Morton D. Weiner/AMPAC (“MDW”), a retail independent insurance agency/broker. Ernesto Guerra (“Guerra”) is an employee of MDW. Other than Guerra, the only employee at MDW with knowledge of Medley’s request for insurance was Mercy Barreto (“Barreto”), a customer service representative. Her duties included communicating with insurance companies or wholesalers for the purpose of obtaining coverage for MOW’S clients.
 

 In December 2004, Barreto contacted Steve Alvarez (“Alvarez”), at Horan Goldman of Florida, Inc., (“Horan”), to inquire whether Horan could secure an insurer willing to provide Medley with insurance. Horan is a surplus line agent for Scottsdale, a foreign corporation doing business in Florida as a surplus or excess insurer. Barreto requested a quote for replacement cost coverage. Alvarez then contacted Scottsdale’s underwriter, Pat Brown (“Brown”), to inquire whether the carrier was interested in providing property and windstorm coverage with replacement cost coverage to Medley.
 

 On January 5, 2005, Brown advised Alvarez that Scottsdale would match the requested price quote for the policy. Subsequently, on January 10, 2005, for the total sum paid of $68,817.71, Scottsdale delivered to Medley a commercial policy of property insurance (the “policy”). The policy stated that it was effective January 10, 2005, and provided for a one-year term of coverage. Additionally, the policy contained supplemental declarations which provided replacement cost coverage for each of the insured warehouses and which also stated that January 10, 2006, was the effective date of coverage.
 
 [1]
 

 The same day the policy was delivered to and paid for by Medley, Scottsdale faxed to Alvarez a brokerage property binder (the “binder”). The binder stated that “[a]ll bound accounts require an in
 
 *443
 
 spection and application signed by the insured” and referenced the policy, the policy’s effective date of January 10, 2005, the total premium amount, and that the policy was for replacement cost value. The binder also stated: “Subject to: Receipt of current replacement cost appraisal within thirty (30) days of effective date.” Alvarez sent the binder to MDW.
 

 Four days later, on January 14, 2005, Scottsdale sent Alvarez a letter which, among other things, requested that he obtain a current replacement cost appraisal within thirty days of the effective date of the policy. The record shows that Alvarez in fact ordered inspections of the warehouses for the purpose of obtaining a replacement cost appraisal from a company called ALPHA Loss Control Services on January 17, 2005. The report on these inspections was completed on January 22, 2005, but did not contain replacement cost appraisals for the warehouses.
 

 Nearly four months later, on May 18, 2005, Alvarez contacted Barreto by e-mail. He informed her that based upon the inspection report and cost appraisal, Scottsdale had concluded that the property values were too low. Alvarez further advised Barreto that Medley had three options: 1) cancel the policy; 2) increase the values of the property; or 3) reduce the coverage from replacement cost coverage to actual cash value. Neither Scottsdale, Horan, nor MDW informed Medley of these options.
 

 On July 1, 2005, Alvarez again contacted Barreto and advised her that another “cost estimator” had been done, and that Scottsdale was insisting that the property values had to be increased to insure the warehouses at their true value, or the coverage reduced from replacement cost coverage to actual cash value. Alvarez also advised Barreto that Brown stated that “[i]f we do not increase the buildings to go with ACV terms then he will cancel the policy.”
 

 On July 6, 2005, Barreto sent the following e-mail to Alvarez: “Hi Steve. Per Ernesto Guerra issue endorsement changing valuation to ACV.” Pursuant to Bar-reto’s e-mail, Scottsdale issued an endorsement to the policy deleting replacement cost coverage, and adding actual cash value coverage. Scottsdale mailed the endorsement to Horan, which in turn mailed it to MDW. MDW never forwarded the endorsement to Medley, and Medley was never informed of the change in insurance coverage.
 

 As a result of Hurricane Wilma, Medley’s warehouses suffered severe roofing damage and collateral water damage. A property damage claim was presented to Scottsdale. Scottsdale paid the claim at actual cash value amount, which was $439,719.88 less than it would have had the policy provided for replacement cost coverage. In April 2006, Medley learned; for the first time, that Scottsdale was claiming that the policy had been amended and that replacement cost coverage had been deleted.
 

 On October 24, 2007, Medley filed a lawsuit against Scottsdale for declaratory relief and damages for breach of contract. In its complaint,' Medley alleged that all acts and conditions requisite to coverage under the policy had been performed. In paragraph 9 of its answer Scottsdale responded that Medley “has not complied with conditions precedent to coverage in that valuation under the policy is based on the actual cash value of damages.” Medley subsequently filed a motion for partial summary judgment on the issue of insurance coverage.
 
 [2]
 
 Medley argued that it was not bound by the change to the policy
 
 *444
 
 because the modification was made without its knowledge or consent. Medley maintained that MDW had no authority to instruct Scottsdale to eliminate replacement cost coverage because the agency relationship between Medley and MDW ended once the policy was issued.
 

 Scottsdale argued that it had never issued a policy to Medley because the condition precedent contained in the binder, requiring receipt of a replacement cost appraisal within thirty days, had not been met. Specifically, Scottsdale claimed that it was Medley’s obligation to obtain-the appraisal and when it failed to do so, Scottsdale was required to obtain its own appraisal months after the thirty-day time frame had expired. As a result, because Scottsdale had never issued a policy, it concluded that MDW remained Medley’s agent and was authorized to continue negotiating and acting on Medley’s behalf when Scottsdale sought to eliminate replacement coverage and add actual cash value.
 

 On April 20, 2009, the trial court entered an order denying Medley’s motion for partial summary judgment, and granting Scottsdale’s motion for summary judgment. Specifically, the trial court found that Scottsdale was “justified in communicating with and relying upon the express instructions of [MDW and Barreto], as agents of [Medley],” and that Scottsdale had “done no wrong to [Medley], has breached no duty to [Medley]” and was entitled to summary judgment. On May 14, 2009, the trial court entered Final Judgment in favor of Scottsdale and this appeal ensued.
 

 II.
 
 STANDARD OF REVIEW
 

 Summary judgment is proper if there is no genuine issue of material fact and if the moving party is entitled to a judgment as a matter of law.
 
 Haddad v.
 
 Hester, 964 So.2d 707 (Fla. 3d DCA 2007). We review the summary judgment under a de novo standard of review.
 
 Building Educ. Corp. v. Ocean Bank,
 
 982 So.2d 37, 40 (Fla. 3d DCA 2008) (finding that this Court reviews a summary judgment order de novo to determine whether, after viewing every inference in favor of the non-moving party, there are any genuine issues of material fact, and, if not, whether the moving party is entitled to judgment as a matter of law).
 
 Bryan v. Dethlefs,
 
 959 So.2d 314 (Fla. 3d DCA 2007);
 
 Am. Eng’g & Dev. Corp. v. Sanchez,
 
 932 So.2d 1241 (Fla. 3d DCA 2006).
 

 III.
 
 ANALYSIS
 

 The crux of this appeal centers on whether MDW remained Medley’s agent after Scottsdale delivered' the policy to Medley on January 10, 2005. In support of its motion for summary judgment, Scottsdale argued that it had never issued the policy to Medley because Medley had failed to satisfy the condition precedent contained in the binder. Scottsdale further argued that because it had never issued the policy, the agency relationship between Medley and MDW was still in existence in July 2005, when it received instructions from Barreto to change the coverage to actual cash value. We find Scottsdale’s argument without merit, and conclude that the trial court erred in finding that MDW was Medley’s agent after the binder had expired and the policy was issued.
 

 It is well settled that a binder is not a policy of insurance, but rather, “a contract either written or oral providing for interim insurance.”
 
 Frank v. Travelers Indem. Co.,
 
 310 So.2d 418, 419 (Fla. 3d DCA 1975);
 
 see also
 
 1A Lee R. Russ & Thomas F. Segalla,
 
 Couch on Insurance 3d
 
 § 13:1 (2009). A binder is “effective at the date of the application and termi-
 
 *445
 
 nat[es] at either the completion or rejection of the principal policy.”
 
 Frank,
 
 310 So.2d at 419. Therefore, a binder is no longer effective once the policy is issued. 4 Eric Mills Holmes,
 
 Holmes’ Appleman on Insurance
 
 2d § 18.1 (1998). A binder may also be of limited duration as set forth in the binder.
 
 Spangler v. State Farm Fire & Cas. Co.,
 
 221 Tenn. 37, 424 S.W.2d 191 (1968);
 
 see Couch
 
 § 13:9 (“Generally a contract of temporary insurance is terminated by the issuance, delivery, and acceptance of a policy, or by a rejection of the application, but if no policy is issued, delivered, and accepted, and the contract is not otherwise terminated, it continues until the time fixed for its termination.... ”); 30A Fla. Jur.2d Insurance § 1405 (2002).
 

 Binders often contain conditions precedent, which must be satisfied in order for the binder to be given effect.
 
 See Couch
 
 § 13:10 (“The effectiveness of a contract of temporary insurance may be made dependent upon the fulfillment of specifically named conditions.... As with any such contractual qualifications, the conditions must be met in order for a contract of temporary insurance to exist.”).
 
 See generally Suarez v. Southland Life Ins. Co.,
 
 158 So.2d 536 (Fla. 2d DCA 1963). Because a binder is a contract of temporary insurance, it is “subject to the same rules of construction as any ordinary contract of insurance.”
 
 Couch
 
 § 13:6. Accordingly, with regard to conditions precedent contained in a binder, “any such conditions must be objective and ascertainable by the insurance applicant.”
 
 Id.
 
 § 13:10.
 
 Cf. In re Estate of Boyar,
 
 592 So.2d 341 (Fla. 4th DCA 1992) (stating rule that conditions precedent must be stated with plain, unambiguous language);
 
 Charles R. Perry Constr., Inc. v. Barry Gibson & Assocs.,
 
 523 So.2d 1221 (Fla. 1st DCA 1988) (same). Accordingly, where the terms of a binder are ambiguous, it is to be construed against the insurer and in favor of the insured.
 
 Peninsular Life Ins. Co. v. Rosin,
 
 104 So.2d 792 (Fla. 2d DCA 1958).
 
 Cf. Hulse v. Blue Cross/Blue Shield of Fla.,
 
 424 So.2d 191 (Fla. 5th DCA 1983) (where insurance policy is capable of two constructions, court should adopt construction favorable to insured).
 

 Here, the condition in the binder states: “Subject to: Receipt of current replacement cost appraisal within thirty (30) days of effective date.” We find the condition to be ambiguous. Although it clearly states a time frame within which Scottsdale is to receive the appraisal, it is silent as to which party has the obligation to perform the appraisal. The condition is thus capable of meaning either that Medley or that Scottsdale have the obligation to obtain the appraisal. Accordingly, we construe the condition against the insurer, Scottsdale, and find that it was Scottsdale’s obligation to obtain its own appraisal of the warehouses. Indeed, the record shows that four days after delivery of the policy, Scottsdale asked Alvarez to obtain such an appraisal and that Alvarez undertook the duty by ordering an inspection. Once the inspection was complete, it appears from the record that it did not contain an appraisal amount, and that Scottsdale did not act on the results of the appraisal. Accordingly, Scottsdale’s argument that it was Medley’s obligation to obtain the appraisal within thirty days and that its failure to do so gave Medley the right to later rely on an appraisal it obtained months after that, is without merit.
 

 As explained above, unless the binder clearly states otherwise, a binder is terminated by the issuance, deliverance, and acceptance of the policy of insurance. In this case, the condition in the binder contains an express time limit, thirty days. In other words, Scottsdale had 30 days within which to obtain a replacement cost appraisal, or the binder would expire by its own terms. Moreover, when the binder
 
 *446
 
 expired after thirty days, Scottsdale had already delivered, and Medley had paid for, the policy of insurance effective January 10, 2005. The policy, having already been delivered by Scottsdale and paid for by Medley, therefore served as Scottsdale’s acceptance of the risk. Accordingly, we conclude that a policy of insurance was in place when Scottsdale sought to eliminate replacement cost coverage from that policy in July 2005.
 

 Because the policy was issued to Medley, Scottsdale was no longer entitled to rely upon MDW and its representations when it sought to alter coverage. It is well settled in Florida that once an insurance policy issues, the insurance agent is no longer the agent for the insured.
 
 Cat ‘n Fiddle, Inc. v. Century Ins. Co.,
 
 213 So.2d 701 (Fla.1968). When Scottsdale threatened to cancel the policy unless the coverage was changed to actual cash value or the values increased, Scottsdale was therefore required to adhere to the cancellation provision in the policy, rather than rely upon Barreto’s statement that Guerra approved a change to the coverage. As such, it was error for the trial court to conclude that MDW was Medley’s agent and that Scottsdale was justified in communicating with and relying upon MDW’s instructions.
 

 IV.
 
 CONCLUSION
 

 Because we find that Scottsdale had issued a policy of insurance to Medley and was no longer entitled to rely upon the representation of MDW, we reverse the final summary judgment entered in favor of Scottsdale and remand with instructions to enter final summary judgment in favor of Medley.
 

 Reversed and remanded.
 

 [1]
 

 . The policy also contained the following relevant provisions:
 

 COMMON POLICY CONDITIONS
 

 B. Changes
 

 This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy’s terms can be amended or waived only by endorsement issued by us and made a part of this policy.
 

 CANCELLATION AND NONRENEWAL— FLORIDA
 

 3.If this policy has been in effect for more than ninety (90) days or is a renewal or continuation of a policy we issued, we may cancel by mailing or delivering written notice of cancellation, including the specific reasons for cancellation, to the first Named Insured at least:
 

 a. Ten (10) days before the effective date of cancellation, if we cancel for nonpayment of any premium when due; or
 

 b. Forty-five (45) days before the effective date of cancellation, if we cancel for any other reason.
 

 4. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.
 

 5. Notice of cancellation by us will state the effective date of the cancellation. The policy period will end on that date.
 

 6. If we fail to mail or deliver our written notice of cancellation to the first Named Insured at least forty-five (45) days or twenty (20) days as required in A.2.b. and A.3.b. above, the coverage will remain in effect until forty-five (45) days after the notice is given or until the effective date of replacement coverage obtained by the first Named Insured, whichever occurs first. The premium for the coverage shall remain the same during any such extension period.
 

 [2]
 

 . Scottsdale filed a cross-motion for summary judgment prior to the hearing.