[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12906

_____

SILVER COMET TERMINAL PARTNERS, LLC,
SILVER COMET PARTNERS, LLC,

Plaintiffs-Appellants,

*versus*

PAULDING COUNTY AIRPORT AUTHORITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 4:18-cv-00239-WMR

_____

Before ROSENBAUM, LAGOA, Circuit Judges, and WETHERELL,* District Judge.

PER CURIAM:

This appeal concerns the fallout from a failed effort to bring commercial passenger service to the Paulding Northwest Atlanta Airport ("the Airport"), which is about forty miles northwest of Hartfield-Jackson Atlanta International Airport. The plaintiff-appellants are two single-purpose entities, Silver Comet Partners, LLC and Silver Comet Terminal Partners, LLC (together, "Silver Comet").[1] The defendant-appellee is the Paulding County Airport Authority, an independent public entity that's charged with constructing, maintaining, and operating airports, including the Airport.

In 2012, the Airport Authority and Silver Comet entered two contracts. Those contracts reflect the parties' agreement to partner with the goal of developing the Airport. Key to this partnership was introducing commercial passenger service to the Airport.

Although the partnership between Silver Comet and the Airport Authority started well, things spiraled in 2015, when Paulding

---

* Honorable T. Kent Wetherell, II, United States District Judge, for the Northern District of Florida, sitting by designation.

[1] The distinction between these entities is irrelevant for our analysis of the issues on appeal. So except when we have reason to distinguish between the two, we refer to both collectively, using "Silver Comet."

County, which co-sponsored the Airport with the Airport Authority, elected a new County Board that vehemently opposed bringing commercial passenger service to the Airport. After progress on developing the Airport reached a standstill, the Airport Authority invoked the termination provisions in both contracts.

Silver Comet then sued the Airport Authority for breach of contract. Along the way, the Airport Authority moved for summary judgment. The district court granted that motion in part, and then held a bench trial to decide the remaining issues. After the bench trial, the district court entered judgment in the Airport Authority's favor. On appeal, Silver Comet challenges the district court's order granting summary judgment and its entry of judgment following the bench trial.

After a thorough review of the record and with the benefit of oral argument, we affirm.

## I. Background

### A. The Parties and the Project

The Georgia Legislature created the Paulding County Airport Authority in 1972. The Authority's task "is to acquire, construct, equip, maintain, improve and operate airports." Although the Airport Authority does not report to the Paulding County Board of Commissioners, the County Board and the Airport Authority contracted to allocate each entity's responsibilities for the Airport. That contract charges the Airport Authority, and not the County Board, with managing the Airport. Still, the County Board,

as a co-sponsor of the Airport, "is just as financially responsible for the airport as the" Airport Authority.

Propeller Airports, LLC ("Propeller"), develops, owns, and operates airports. The man behind Propeller is Brett Smith. A self-described "businessman," Smith specializes in partnering with public entities to bring commercial passenger service to small, local airports. Perhaps the brainchild for Smith's business plan is Gil Morgan, whose résumé comprises more than forty years of experience in the aeronautical industry and includes stints with airlines like Delta, AirTran, and World Airways. Together, Morgan and Smith created a model that generates profit by building a terminal at a smaller airport, introducing commercial passenger service to that airport, and surrounding the airport with various types of aeronautical-related revenue streams. Those revenue streams can include anything from concessions to parking, maintenance fees, and even defense contracts.

In 2012, Smith and the Airport Authority started discussing an opportunity at the Airport. Those discussions had two components: commercial passenger service and property development.

To pursue those projects, Smith created two entities, one for each project. Those entities are Silver Comet Partners, LLC and Silver Comet Terminal Partners, LLC, both of which are subsidiaries of Propeller. Together, they are the plaintiff-appellants in this case.

### B.  The Agreements

Silver Comet and the Airport Authority entered into two agreements pertinent to this appeal:  the Lease Option Agreement and the Airport Use Agreement.

The Lease Option Agreement, which became effective on October 24, 2012, was between Sliver Comet Partners, LLC, and the Airport Authority.  Broadly speaking, the Lease Option Agreement reflected Silver Comet's agreement to market and develop land at the Airport.

The Airport Use Agreement, which became effective on December 1, 2012, was between Silver Comet Terminal Partners, LLC and the Airport Authority.  Broadly speaking, the Airport Use Agreement reflected Silver Comet's agreement to bring commercial passenger service to the Airport.

### i.  Lease Option Agreement

The Lease Option Agreement obliged Silver Comet to use "reasonable efforts to market" the option property[2] "for the development of aviation and non-aeronautical related operations . . . ."  In exchange for marketing the option property, the Lease Option Agreement granted Silver Comet "an exclusive right and option to ground lease the Option Property, subject to the terms and conditions" of the Lease Option Agreement.  That option would expire

---

[2] The option property was about 60 acres, divided into three tracts, all of which surrounded the Airport's terminal and runway.

after fifteen years.  This appeal implicates two aspects of the Lease Option Agreement: its termination provision and its representations and warranties.

We'll start with the provision concerning the Airport Authority's right to terminate the agreement, which did not ripen until three years after the agreement's effective date.  From that point forward, the contract entitled the Airport Authority to send Silver Comet a "marketing notice" if the former "in good faith reasonably determine[d] that Silver Comet [was] not using reasonable efforts to market the Option Property . . . ."  Such a marketing notice would convey to Silver Comet that unless it started "to use reasonable efforts to . . . market the Option Property within twelve . . . months from the date of the Marketing Notice, then at the end of such 12-month period the Lease Option shall no longer be valid."  But that termination was not self-executing.  Rather, "at any time after the expiration of the applicable 12-month period," the Airport Authority needed to send Silver Comet a "termination notice" once the former "in good faith reasonably determine[d] that Silver Comet ha[d] not commenced to use reasonable efforts" to market the option property.

In sum, the Airport Authority could exercise its right to terminate the Lease Option Agreement only after taking two steps (neither of which it could take until three years after the agreement's effective date).  First, it had to send Silver Comet a "marketing notice" after reasonably and in good faith determining that Silver Comet was not using reasonable efforts to market the option

property.  The marketing notice then triggered a twelve-month cure period, during which Silver Comet could cure its deficient marketing efforts by employing reasonable efforts to market the option property.  The second step occurred at the end of that cure period. From that point on, the Airport Authority could send Silver Comet a "termination notice" after reasonably and in good faith determining that Silver Comet had not started to use reasonable efforts to market the option property.

This appeal also implicates the Lease Option Agreement's representations and warranties.  Under those provisions, the Airport Authority made eleven "representations and warranties" that were "true and correct" on the day of closing and that would be "true and correct" on the day that Silver Comet exercised its option to ground lease the option property.

Only two of those representations and warranties are relevant here.  First, the Airport Authority represented and warranted that there "are no leases, licenses, or occupancy rights, or any contracts, option[s] or other agreements of any kind (including purchase or lease options), affecting the Option Property."  The second "representation and warranty" was more of a promise than it was a representation and warranty.  In any case, that provision, in broad terms, required the Airport Authority to disclose to Silver Comet anything that directly or indirectly related to one of the other representations or warranties:

> Between the Effective date and the . . . Expiration
> Date . . . [the Airport Authority] shall notify Silver

> Comet of any notice, whether written or oral, that re-
> lates directly or indirectly upon any representation or
> warranty hereunder, which notice shall be delivered
> to Silver Comet immediately after receipt of such no-
> tice but in no event later than the date that Silver
> Comet exercises the Lease Option.

In sum, then, the Airport Authority promised to "notify Silver Comet" about future "agreements of any kind" that might affect the option property.

### ii. Airport Use Agreement

Under the Airport Use Agreement, the Airport Authority leased to Silver Comet 700 square feet of office space in the terminal building. The lease was for twenty years. During that lease period, the Airport Use Agreement also granted Silver Comet certain rights.

This appeal implicates three of those rights. First, the Airport Use Agreement granted Silver Comet an exclusive right to expand its lease to include the entire terminal building or any part of it. Second, the Airport Use Agreement entitled Silver Comet to "require the [Airport Authority] to apply for [a] Part 139 Airport Operating Certification[3] . . . with the Federal Aviation Administration for the Paulding Northwest Atlanta Airport." Third, the

---

[3] A Part 139 certification enables an airport to offer commercial passenger service. *See* 14 CFR § 139, *et seq.*

Airport Use Agreement required the Airport Authority to "indemnify and hold Tenant harmless from and against any and all claims, actions, damages, liability, and expense in connection with the [Airport Authority's] application for Certification hereunder." The Airport Use Agreement defined "Tenant" as Silver Comet.

This appeal also implicates the Airport Use Agreement's termination provision. Under that provision, the Airport Authority could terminate the lease five years after its effective date unless at least one of two conditions were satisfied. First, the Airport Authority could not terminate the lease if Silver Comet exercised its option to occupy "the entire Terminal Building." Second, the Airport Authority could not terminate the lease if there was "commercial passenger service at the Paulding Northwest Atlanta Airport." If neither of those conditions were satisfied, then the Airport Authority could terminate its lease by giving "one hundred twenty (120) days advance written notice" to Silver Comet.

## C. Implementation and Termination of the Agreements

From the time the Lease Option Agreement and Airport Use Agreement took effect until 2015, Silver Comet marketed the option property. Silver Comet attended "various trade shows, including the 2014 National Business Aviation Association Conference," where it promoted the option property.

But resistance to the project eventually snowballed, with the Airport Authority being named as a defendant in at least eight lawsuits. A group of taxpayers, who became known as the "Paulding

Six" filed several lawsuits challenging the Airport Authority's efforts to bring commercial passenger service to the Airport. The City of Atlanta also sued.

Political pressure also began to build. Although the County Board once favored bringing commercial passenger service to the Airport, that changed after a 2014 election ushered in a new majority. On January 13, 2015, the newly elected County Board, as its first official act, passed Resolution 15-01. That resolution withdrew the County's application for a Part 139 Certification, dashing any hopes for bringing commercial passenger service to the Airport:

> NOW, THEREFORE, be it resolved by the Paulding County Board of Commissioners as an Airport sponsor that the application to the FAA for a Part 139 Certificate is hereby withdrawn and any associated environmental review is hereby terminated. Accordingly, the Board of Commissioners hereby directs the Clerk to transmit immediately this Resolution to the FAA.

Eleven months later, the County sued the Airport Authority in state court, seeking to enjoin the Authority from obtaining a Part 139 Certification. The County also sought "a declaration determining that the Airport Authority did not have the power to pursue a Part 139 application given the County's new opposition to it." Silver Comet intervened in that litigation with the Airport Authority's consent.

Enter Mark Reichin, Chief Operating Officer of Propeller. Reichin had been involved with Silver Comet's projects in Paulding County since 2012. He and Smith assumed primary responsibility for Silver Comet's efforts to market the option property. At the start of his involvement, Reichin commuted "back and forth between New York and Atlanta as necessary" to attend meetings and the like. But he eventually moved to Georgia in "early 2015," meaning that he moved right when the County made its about face on introducing commercial passenger service to the Airport.

As Reichin saw things, the County's actions from 2015 on effectively created a "blockade" on Silver Comet's ability to do anything at the Airport. Not only that, but Reichin also thought that it was "going to be hard" to market the option property until all the lawsuits against the Airport Authority were "resolved."

Adding to those difficulties was the end of then-Director of the Airport Authority Blake Swafford's tenure, which occurred in April 2016. That made Reichin's job even harder because he and Swafford spoke regularly about marketing. The two also often discussed the Airport's pending environmental assessment, which was essential for the Airport to obtain a Part 139 certification. "And being there on the site with Blake Swafford to try to work through the environmental assessment," said Reichin, "it was more efficient being there all the time."

Terry Tibbitts replaced Swafford as the director of the Airport Authority. Tibbitts, according to Reichin, "wanted to sort of

be hands off." Still, Tibbitts kept updating Smith about the Airport Authority's progress on obtaining a Part 139 certification.

Four months after Swafford's tenure with the Airport Authority ended, Propeller moved Reichin to Everett, Washington, to help develop a different project. That project was very successful.

Reichin maintains that he did not abandon the Airport project after leaving Georgia. But his actions tell a different story. While he attended several trade shows in 2015, Reichin attended none in 2017 or 2018. Although he traded emails with prospective companies in 2015, he sent none to prospective companies in 2017 or 2018. And then there's the website that Silver Comet created. Reichin concedes that the website hasn't been updated since it was created in 2014. Also, while Reichin met with real-estate brokers between 2013 and 2014, he met with none after he moved to Seattle. In fact, the website even had a feature that allowed real-estate brokers to contact Silver Comet—but the one broker who used that feature never received a response.

About five months after Reichin left Georgia, the Airport Authority sent a marketing notice to Silver Comet, thus triggering Silver Comet's twelve-month period to "commence to use reasonable efforts" to market the Airport. Although Silver Comet responded, its response did not dispute that it had quit marketing the Airport.

One year after the Airport Authority sent Silver Comet the marketing notice, the Airport Authority invited Silver Comet to attend a meeting.  That meeting occurred on December 20, 2017.

Silver Comet sent Morgan to that meeting.  The minutes from that meeting suggest only that the Airport Authority gave Silver Comet thirty more days "to document marketing efforts." Morgan recalled that Silver Comet was "specifically asked to document the marketing expenses up to that time."

Morgan and Tibbitts then met twice for lunch, first in late December 2017 and again in early January 2018.  Morgan brought with him to those meetings a three-page PowerPoint presentation. That presentation documented Silver Comet's obligations under the Lease Option Agreement, the expenses Silver Comet incurred while fulfilling those obligations, and the results (and the excuses for the lack of results) that Silver Comet produced.  After making his case, Morgan asked Tibbitts if he wanted a copy of the Power-Point. But Tibbitts told Morgan to "hold onto it for now."

When Tibbitts reported to the Airport Authority's board, the board asked him if he had received from Morgan any evidence that Silver Comet had commenced marketing.  "No," he said.  "I never got anything."

By June 2018, the Airport Authority had decided to terminate the Lease Option Agreement because it still hadn't received anything "to satisfy" its concerns about Silver Comet's marketing efforts.  The Airport Authority then took marketing into its own

hands.  The month after the Authority decided to terminate the Lease Option Agreement, David Carmichael, who sat on the Airport Authority's Board, became involved in discussions to lease airport property to an aviation academy.  Tibbitts learned about those discussions by August 2018.  But nobody spoke with Smith about those discussions.  When asked why nobody spoke with Smith about the aviation academy, Carmichael said, "I probably should have done that."

In any case, the Airport Authority finalized its decision to terminate the Lease Option Agreement the next month.  On September 13, 2018, the Airport Authority sent Silver Comet a termination notice, effectively terminating the Lease Agreement.  Tibbitts met with Georgia officials about the aviation academy less than two weeks later.  The Airport Authority finally notified Silver Comet about its discussions with the aviation academy on October 11, 2018, the day before then-Governor Nathan Deal made a public announcement about the project.

The summer of 2018 also proved important for Silver Comet's expansion rights under the Airport Use Agreement. As we've mentioned, the Airport Use Agreement granted Silver Comet the right to expand its lease of part of the terminal building to include the entire terminal building or any other part of it.  Silver Comet sent the Airport Authority a letter at the end of June, notifying the Authority of Silver Comet's "intent to exercise" its expansion rights under the Airport Use Agreement by expanding its lease to the entire terminal building.

The Airport Authority responded to Silver Comet's notice of intent one month later. Relying on the terms of the Airport Use Agreement, the Airport Authority's response explained how it reached its calculation that "the total monthly lease rate [would be] $19,904.40." The Airport Authority asked Silver Comet to forward its first month's payment on or before September 1, 2018, so that the Airport Authority would "have sufficient time to vacate the entire building."

Silver Comet replied on September 5, 2018, asking the Airport Authority to "amend the Lease to reflect . . . Silver Comet's exercise of its expansion option to lease the Terminal Building." In that reply, Silver Comet asked the Airport Authority to prepare a draft lease.

The Airport Authority complied and provided Silver Comet with a draft lease less than two weeks later. But Silver Comet asked the Airport Authority to change that lease in two ways. First, it wanted the Airport Authority to push the effective date back to December 1, 2018. Second, it wanted the Airport Authority to reduce the price to $1 per square foot. The Airport Authority agreed to both requests and supplied Silver Comet with an updated lease.

But even then, Silver Comet was not ready to conclude the lease expansion. Instead, it sent a letter asking that "the effective date of December 1, 2018 be placed on hold pending the outcome of" this lawsuit. This time, the Airport Authority rejected Silver Comet's request and told it that the Airport Authority would assume it did not intend to lease the terminal building unless the

Airport Authority received "an executed lease and payment" before December 1, 2018.  Silver Comet never sent the Airport Authority an executed lease or payment. The Airport Authority then terminated the Airport Use Agreement on December 7, 2018.

### B.  Lawsuit

After the Airport Authority terminated the Airport Use Agreement, Silver Comet filed suit against the Airport Authority in the Northern District of Georgia.  Silver Comet's operative complaint raised three claims that are relevant to this appeal.

The first two claims allege that the Airport Authority breached the Lease Option Agreement.  The first of those allegations states that the Airport Authority breached the Lease Option Agreement "by sending its Termination Notice without reasonably determining in good faith that Silver Comet ha[d] not commenced to use reasonable efforts to market the Option Property."  Silver Comet also alleged that the Airport Authority breached the Lease Option Agreement by failing to disclose to Silver Comet that the Authority had reached an agreement with the Governor to locate an aviation academy at the Airport.

The third claim alleged that the Airport Authority breached the Airport Use Agreement.  Silver Comet asserted that the Airport Authority did so by declining to indemnify Silver Comet for expenses it incurred when applying for the Part 139 certification.  In the same count, Silver Comet sought a declaration of its rights under the Airport Use Agreement.

### i. Summary Judgment Rulings

The parties eventually filed cross-motions for summary judgment. The district court denied Silver Comet's motion in full and granted the Airport Authority's motion in part. The district court's ruling on the Airport Authority's motion prompts two issues on appeal.

First, Silver Comet contends that the district court erred by granting summary judgment on its claim relating to the Airport Authority's discussions about bringing an aviation academy to the Airport. As a reminder, one of the Lease Option Agreement's representations and warranties provided in part that there "are no . . . agreements of any kind . . . affecting the Option Property." A second warranty required the Airport Authority to immediately "notify Silver Comet of any notice, whether oral or written, that relates directly or indirectly" to any other representation or warranty.

The district court determined that the Airport Authority did not breach the Lease Option Agreement's representation-and-warranties provisions, despite failing to contemporaneously disclose to Silver Comet its discussions regarding the aviation academy. In so holding, the district court explained that the relevant warranty applied to only those agreements or contracts that could have encumbered the option property. Because the Airport Authority's discussions with the aviation academy were not "formal agreements," the district court held that the Airport Authority did not breach the representation or warranty provision by failing to disclose the discussions.

Second, Silver Comet contends that the district court erred by granting summary judgment on its claim that the Airport Authority failed to indemnify Silver Comet for expenses connected to the Part 139 certification application.  As a reminder, the Airport Use Agreement required the Airport Authority to "indemnify and hold [Silver Comet] harmless from and against any and all claims, actions, damages, liability, and expense in connection with the [Airport Authority's] application for" a Part 139 certification.

The district court granted summary judgment on that claim for three reasons, all of which are different formulations of the conclusion that the indemnification provision did not cover Silver Comet's claimed expenses.  First, the district court held that the indemnification provision covered only those expenses incurred by Silver Comet—not those incurred by Silver Comet's parent company, Propeller.  Second, the district court held that the indemnification provision did not cover expenses Silver Comet incurred when expanding the airport's taxiway.  Those expenses, the district court explained, fell under an exception to the indemnification provision, which applied to improvement payments.  Finally, the court concluded, "the indemnification provision d[id] not include the phrase 'attorney's fees,' so [Silver Comet] [wa]s unable to recover its fees as such."

The district court's order partially granting summary judgment left two issues to be decided during a bench trial.  First, the district court found that a genuine issue of material fact existed as to whether the Airport Authority could terminate the Lease

Option Agreement. Specifically, the court identified a genuine issue of fact as to whether the Airport Authority reasonably and in good faith determined that Silver Comet had not commenced using reasonable efforts to market the option property after receiving a marketing notice from the Airport Authority. Second, the district court later clarified that its order partially granting summary judgment did not address whether the Airport Authority could "terminate the Airport Use Agreement according to its terms." The court resolved those two issues after a four-day bench trial.

### ii. Bench Trial Rulings

The first issue at trial was whether the Airport Authority could terminate the Lease Option Agreement. As the district court explained, whether the Airport Authority could terminate the Lease Agreement turns on two subsidiary issues: "(1) whether the Airport Authority's decision to terminate was executed in good faith, and (2) whether it was reasonable for the Airport Authority to determine that [Silver Comet] was not using reasonable efforts to market the property."

The district court concluded that the Airport Authority terminated the Lease Option Agreement in good faith for two reasons. First, it found that the Airport Authority decided to terminate the Lease Option Agreement in June 2018. So even though the Authority started discussing an opportunity with the aviation academy in July 2018, that fact did not reflect bad faith. In the district court's telling, "the record contradicts any suggestion that the Airport Authority terminated the option in bad faith (or that it didn't

act in good faith) because it allegedly knew of the opportunity with the Aviation School and wanted to pursue it instead. Second, the district court concluded that "the fact that [Director] Tibbitts did not turn over to the Airport Authority's Board the PowerPoint created by Brett Smith with a list of expenses that Propeller has made does not constitute bad faith or indicate a lack of good faith." Those expenses, reasoned the district court, lack any "details of specific, recent marketing efforts, despite [Silver Comet's] having been on notice that their marketing efforts were lacking."

The district court also found that it was reasonable for the Airport Authority to terminate the Lease Option Agreement. The district court acknowledged that there was no dispute that Silver Comet "marketed the property extensively" before receiving the marketing notice. It also recognized the difficult task Silver Comet faced in marketing the property, given all the pending litigation. Still, the district court explained that "there is a difference between successful marketing efforts and simply engaging in reasonable marketing efforts." Finding that Silver Comet failed to do the latter, the district court concluded that it was reasonable for the Airport Authority to terminate the Lease Option Agreement.

The second issue at trial was whether the Airport Authority could terminate the Airport Use Agreement. As the district court explained, "the Airport Authority had a contractual right to terminate the [Airport] Agreement if two conditions were met: (1) there was no commercial passenger service at the airport, and (2) [Silver Comet] had not exercised its option to lease the entire terminal

building."  And, the district court continued, there was no dispute "that commercial passenger service was not instituted" at the Airport. "Thus, the only question for the Court [wa]s whether [Silver Comet] in fact exercised its option to lease the [terminal] building."

The district court concluded it did not.  To reach that conclusion, the district court cited two facts.  First, Silver Comet's letter in June 2018 expressed only its "*intent* to exercise its right to expand." (Emphasis added).  Second, in its final email to the Airport Authority before the Airport Authority terminated the Airport Use Agreement, Silver Comet asked the Airport Authority to put the lease's effective date on hold.  As a result, the district court concluded that the Airport Authority had not exercised its option to lease the terminal building, so the Authority enjoyed the right to terminate the Airport Use Agreement.

## II.  Analysis

### A.  Jurisdiction

We carried two jurisdictional questions with this case.  We turn to them now and explain why we have jurisdiction.

### i.  Count 5

First, we must consider "whether Count 5 of the amended complaint has been resolved."  In Count 5 of its amended complaint, Silver Comet alleged that the Airport Authority violated Georgia's Open Records Act.  After a hearing, the district court created a paperless docket entry, which indicates that the parties told the district that they intended to file a stipulation to dismiss Count

5 of Silver Comet's amended complaint. But as it turns out, the parties never filed any stipulation. Still, though, they did submit a proposed pretrial order, which stated "that it supersedes the pleadings which are hereby amended to conform" to the proposed pretrial order. That proposed pretrial order contained both parties' signatures, omitted any reference to Count 5 of Silver Comet's amended complaint, and generally reflected the parties' understanding that the looming bench trial would not concern Count 5. Although the district court never adopted that proposed pretrial order, it did confirm that it had "read the pretrial order." The question, then, is whether the parties' proposed pretrial order sufficed to resolve Count 5 of Silver Comet's amended complaint. We conclude that it did.

To begin with, we have jurisdiction over this appeal only if the district court entered a final order. 28 U.S.C. § 1291. "A final decision is 'one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *CSX Transp., Inc. v. Garden City*, 235 F.3d 1325, 1327 (11th Cir. 2000) (quoting *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1368 (11th Cir. 1983)). When considering whether an order is final, "we take a 'functional approach, looking not to the form of the district court's order, but to its actual effect.'" *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 823, 829 (11th Cir. 2010) (quoting *Birmingham Fire Fighters Ass'n 117 v. Jefferson County*, 280 F.3d 1289, 1293 (11th Cir. 2002)).

The parties' failure to file a stipulation of dismissal for Count 5 is irrelevant to our analysis of this jurisdictional question. Even if the parties had filed a stipulation to dismiss Count 5 of Silver Comet's amended complaint, that filing would not have resolved the claim. A party (like Silver Comet) that wishes to dismiss a claim (rather than an entire action) must do so by amending the complaint under Rule 15(a) rather than by filing a stipulation of dismissal under Rule 41. *See Campbell v. Altec Indus., Inc.*, 605 F.3d 839, 841 n.1 (11th Cir. 2010) (quoting *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1106 (11th Cir. 2004)).

On that score, Silver Comet effectively amended its complaint to drop Count 5. Under Rule 15(a), "a party may amend its pleading only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2).[4] Here, Silver Comet obtained the Airport Authority's consent to drop Count 5 when both parties signed the proposed pretrial order, which reflected their shared understanding that that the looming bench trial would not concern Count 5. *Cf. Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1461–62 (11th Cir. 1998) (affirming the district court's ruling that a plaintiff abandoned its claim under 42 U.S.C. 1981(a) when "the

[4] A party may also amend its pleadings once as a matter of course within 21 days of serving it, unless the pleading requires a response, in which case the party may amend as a matter of course 21 days after service of the responsive pleading or "21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." FED. R. CIV. P. 15(a)(1). However, that provision is not implicated here.

21-12906                Opinion of the Court                24

pretrial stipulation [did] not reference § 1981(a) at any point."). That proposed pretrial order also provided "that it supersedes the pleadings which are hereby amended to conform" to the proposed pretrial order. *See State Treasurer of State of Michigan v. Barry*, 168 F.3d 8, 9–10 (11th Cir. 1999) ("Because a pretrial order supersedes the pleadings, the pretrial order had the effect of eliminating the remaining [c]ounts … in Plaintiff's complaint.").

That amendment, coupled with the parties' statement to the district court that they intended to dismiss Count 5 of the complaint, operated as the functional equivalent of a dismissal of Count 5.[5]  Indeed, we said as much in *Campbell*, where we held that a district court's order granting a Rule 51(a) motion, "coupled with the" plaintiff's "announcement on the record" that it would abandon that claim, "operated as the functional equivalent of a dismissal . . . turning the district court's summary judgment order into a final judgment." 605 F.3d at 841 n.1.  In the same way, the parties' announcement to the district court that they intended to dismiss Count 5, coupled with their proposed pretrial order, which effectively amended the complaint to eliminate Count 5, suffices to establish that Count 5 has been resolved.

---

[5] The district court entered a final judgment after the bench trial.  Whether the parties' dismissal was with or without prejudice is therefore irrelevant for finality purposes. *See Schoenfeld v. Babbitt*, 168 F.3d 1257, 1265–66 (11th Cir. 1999) (holding that there was a final judgment when the plaintiff dismissed its claim "without prejudice before the district court entered the order granting summary judgment and entered a final judgment.").

### ii. Count 4

The second jurisdictional question we carried with this case is "whether the stipulation of dismissal of Count 4 was effective, given that the parties purported to dismiss a single claim instead of the entire action." Unlike their handling of Count 5, the parties did file a joint stipulation dismissing Count 4 of Silver Comet's amended complaint. When the district court subsequently entered its order granting partial summary judgement, it acknowledged the parties' joint stipulation of dismissal for Count 4 and added, "If the record otherwise does not contain a document of dismissal, the Court herein dismisses [Count 4] without prejudice."

Even though the parties' Rule 41(a) motions and stipulation did not effectively dismiss Count 4, the district court cured that defect. It's true that litigants cannot use Rule 41 to dismiss a single claim. *See Campbell*, 605 F.3d at 841 n.1. But the district court dismissed Count 4 in any case, so whether the stipulation of dismissal of Count 4 was effective is beside the point. Because the district court dismissed Count 4 without prejudice before entering its final judgment, Count 4 has been resolved. *See Schoenfeld*, 168 F.3d at 1265–66.

Having assured ourselves that we have jurisdiction over this appeal, we will now turn to the merits of the issues raised by Silver Comet.

### B. Merits

Summary judgment is proper only when "there is no genuine dispute as to any material fact" and the prevailing party "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When passing upon a motion for summary judgment, a district court must take the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences therefrom in that party's favor. *E.g.*, *Westchester Gen. Hosp. v. Evanston Ins. Co.*, 48 F.4th 1298, 1301–02 (11th Cir. 2022) (citation omitted). We must do the same because we review de novo a district court's order granting summary judgment. *Id.*

On appeal from a judgment after a bench trial, we review the district court's conclusions of law, including its application of the law to the facts, de novo, while evaluating its finding of facts under the clear-error standard. *U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1322 (11th Cir. 2018) (citations omitted).

Silver Comet argues that the district court erred in four ways. First, Silver Comet asserts that the district court erred by finding, after a bench trial, that the Airport Authority could terminate the Lease Option Agreement. Second, Silver Comet contends that the district court erred by granting summary judgment on Silver Comet's claim that the Airport Authority breached the Lease Option Agreement's representations-and-warranties provisions. Third, Silver Comet argues that the district court erred by granting summary judgment on Silver Comet's claim that the Airport

Authority breached the Airport Use Agreement's indemnification provision. Finally, Silver Comet argues that the district court erred by finding, after a bench trial, that Silver Comet never exercised its expansion rights under the Airport Use Agreement and, as a result, that the Airport Authority could terminate the Airport Use Agreement.

After addressing and rejecting each argument in turn, we affirm the district court's order granting partial summary judgment in the Airport Authority's favor and its entry of judgment after the bench trial.

### i. Termination of Lease Option Agreement

We start with Silver Comet's argument that the district court clearly erred by finding, after a bench trial, that the Airport Authority could terminate the Lease Option Agreement. The Airport Authority could terminate the Lease Option Agreement if it in good faith and reasonably determined that Silver Comet had "not commenced to use reasonable efforts" to market the option property after receiving the marketing notice.

The district court concluded both that (1) the Airport Authority decided to terminate the Lease Option Agreement in good faith; and (2) the Airport Authority reasonably determined that Silver Comet had not commenced using reasonable efforts to market the option property after receiving the marketing notice. Alleging error, Silver Comet cites Tibbitt's failure to transmit Silver Comet's

three-page PowerPoint presentation to the rest of the Airport Authority's Board.

Silver Comet's two-paragraph argument misses the mark because the PowerPoint presentation contained information that the Airport Authority already knew.  The three-page PowerPoint presentation documented all Silver Comet's marketing efforts since 2012.  Yet Tibbitts "was briefed very thoroughly on everything that happened basically since 2012."  The problem, he explained, was that the Airport Authority "felt there was no marketing taking place" after 2016.  And the PowerPoint presentation failed to address that concern.  So even if Tibbitts had transmitted that PowerPoint to the rest of the Airport Authority's Board, its content would not be helpful for determining whether Silver Comet had commenced using reasonable efforts to market the option property after receiving the marketing notice in December 2016.

For that reason, Tibbitts's failure to transmit the Power-Point presentation to the rest of the Airport Authority's Board does not evince a lack of good faith.  Under Georgia law, good faith requires, among other things, "further investigation" when the "known circumstances" so require. *Riggins v. Deutsche Bank Nat'l Tr. Co.*, 708 S.E.2d 266, 269 (Ga. 2011) (quoting *Anderson v. Little & Davenport Funeral Home, Inc.*, 251 S.E.2d 250, 252 (Ga. 1978)); *see also Drs. Hosp. of Augusta, LLC v. Alicea*, 788 S.E.2d 392, 403 (Ga. 2016) (citation omitted).  Because the Airport Authority's Board already knew the facts conveyed by the PowerPoint

21-12906               Opinion of the Court               29

presentation, there was no need for the Airport Authority's Board to further investigate that PowerPoint presentation.

Putting the PowerPoint presentation aside, the record more than supports the district court's conclusion that the Airport Authority reasonably and in good faith determined that Silver Comet did not start marketing the option property after receiving the marketing notice and that it terminated the Lease Option Agreement. Indeed, after receiving the marketing notice, Silver Comet wrote the Airport Authority a letter and acknowledged that it had stopped marketing the property.

And Silver Comet's actions support the conclusion that it had ceased marketing the option property by 2016. Reichin testified that while he attended several trade shows in 2015, he attended none in 2017 or 2018. In the same vein, Reichin testified that though he traded emails with prospective companies in 2015, he failed to email prospective companies in 2017 or 2018. Reichin also admitted that, in his view, Paulding County's actions from 2015 on effectively created a "blockade" on Silver Comet's ability to do anything at the Airport. And the Airport Authority, according to Tibbitts, got the message loud and clear: "They [the Airport Authority] had become concerned that because of the situation that was in Paulding County at that time, that the marketing had ceased."

In short, Silver Comet's argument fails to show that the district court clearly erred by finding that the Airport Authority reasonably and in good faith terminated the Lease Option Agreement.

### ii. Breach of Warranties in Lease Option Agreement

Our conclusion that the district court did not clearly err by finding that the Airport Authority could terminate the Lease Option Agreement forecloses Silver Comet's second argument related to the Lease Option Agreement.  Here, Silver Comet contends that the district court erred by granting summary judgment on its claim that the Airport Authority breached the Lease Option Agreement's representations-and-warranties provisions.

That claim turns on two of the representations and warranties.  First, the Airport Authority represented and warranted that there were "no leases, licenses, or occupancy rights, or any contracts, option or other agreements of any kind (including any purchase or lease options), affecting the Option Property."  Second, the Airport Authority promised to "notify Silver Comet" about any "notice" that it received, which "relates directly or indirectly" to any of the representations and warranties.  The Airport Use Agreement required the Airport Authority to deliver such notice no "later than the date that Silver Comet exercises the Lease Option."

Silver Comet reads those provisions broadly.  In its view, those provisions saddled the Airport Authority with "a continuing duty to notify Silver Comet of any agreement of any kind, including an informal agreement."  On that basis, Silver Comet argues that the Airport Authority breached the representations-and-warranties provisions by failing to disclose its "agreements" (1) to meet with Georgia officials in September 2018 to discuss the location of

a proposed aviation academy and (2) to obtain an environmental assessment on the proposed location.

The district court rejected Silver Comet's interpretation, concluding that the representations-and-warranties provisions did not require the Airport Authority to disclose informal agreements such as "discussions or negotiations involving the option property." As a result, the district court granted summary judgment on Silver Comet's claim that the Airport Authority breached the Lease Option Agreement's representations-and-warranties provisions. Silver Comet now argues that the district court's interpretation was erroneous.

But even granting Silver Comet's broad reading of the representations-and-warranties provisions, Silver Comet's claim that the Airport Authority breached those provisions still fails. That's so because Silver Comet claims that the Airport Authority breached those provisions by entering two agreements *after* the Airport Authority already terminated the Lease Option Agreement. First, the Airport Authority met with Georgia officials on September 26, almost two weeks after terminating the Lease Option Agreement. Second, the Airport Authority's agreement to obtain an environmental assessment occurred just days after the Airport Authority's September 26 meeting with Georgia officials. But a party cannot breach an agreement after the agreement has already been terminated. So even if the district court misinterpreted the representation-and-warranties provisions, it does not follow that the Airport Authority breached those provisions.

Yet, Silver Comet argues that because it timely disputed the Airport Authority's notice of termination pursuant to the terms of the Lease Option Agreement, the Airport Authority's obligations under the representations and warranties survived until a court determined that the September 13 termination notice was valid. We reject the implication that the contract allowed Silver Comet to unilaterally extend the Airport Authority's obligations past a valid termination merely by filing an ultimately meritless dispute. Such a reading would dramatically undermine the utility of the early termination provision, and Georgia law requires contract interpretation "to give the greatest effect possible to all provisions rather than to leave any part of the contract unreasonable or having no effect." *Vaughn, Coltrane & Assocs. V. Van horn Const., Inc.*, 563 S.E.2d 548, 550 (Ga. Ct. App. 2002) (quoting *Sofran Peachtree City v. Peachtree City Holdings*, 550 S.E.2d 429, 431 (Ga. Ct. App. 2001)).

We therefore affirm the district court's entry of judgment on Silver Comet's claim that the Airport Authority breached the Lease Option Agreement's representations-and-warranties provisions.

### iii. Indemnification Under the Airport Use Agreement

Silver Comet's third argument stems from its claim that the Airport Authority breached the Airport Use Agreement by refusing to indemnify Silver Comet for expenses it incurred when applying for the Part 139 certification. The Airport Use Agreement required the Airport Authority to apply for a Part 139 certification with the FAA. The Airport Use Agreement also required the Airport

Authority to "use its best efforts to obtain such Certification, including without limitation, making all financially feasible improvements . . . necessary to obtain such Certification . . . ." The same provision then required the Airport Authority to "indemnify and hold Tenant [i.e., Silver Comet] harmless from and against any and all claims, actions, damages, liability and expense in connection with the [Airport Authority's] application for Certification hereunder."

The district court granted summary judgment on this claim after concluding that the Airport Use Agreement's indemnity provision did not cover the expenses for which Silver Comet sought indemnification. The district court offered three reasons to support that conclusion. First, the district court held that the indemnification provision covers only those expenses paid for by Silver Comet. And there is no dispute that Silver Comet's parent company, Propeller, paid for all the expenses for which Silver Comet now seeks indemnification.

Second, the district court held that even if the Airport Use Agreement requires the Airport Authority to indemnify Silver Comet against those expenses paid for by Propeller, the indemnity provision does not cover expenses Silver Comet incurred when expanding the airport's taxiway. Those expenses, the district court explained, fall under an exception to the indemnification provision that applies to improvement payments.

Finally, the district court held that even if the Airport Use Agreement requires the Airport Authority to indemnify Silver

Comet against those expenses paid for by Propeller, "the indemnification provision does not include the phrase 'attorney's fees,' so [Silver Comet] is unable to recover its fees as such."

We agree with the district court that the indemnity provision covers only those expenses paid for by Silver Comet, not those paid for by its parent company, Propeller. That obviates the need for us to address the other two issues. Still, though, we also agree with the district court's alternative holdings that, in any case, the indemnity provision does not cover Silver Comet's legal fees or moneys spent in connection with the taxiway project. We therefore affirm the district court's order granting summary judgment.

### a. Expenses Paid by Propeller.

The district court concluded that the Airport Use Agreement's indemnity provision did not require the Airport Authority to indemnify Silver Comet against expenses paid for by its parent company, Propeller. That provision, explained the district court, "does not require indemnification for expenses incurred by anyone other than 'Tenant.'" "And," the district court continued, "the 'Tenant' is [Silver Comet] and [Silver Comet] only." We agree.

The indemnity provision in the Airport Use Agreement provides that the Airport Authority "shall indemnify and hold Tenant harmless from and against any and all … expense[s]" in connection with the Airport Authority's application for a Part 139 certification. And the first line of the Agreement defines Tenant as "Silver Comet Terminal Partners, LLC," not Propeller. If the parties intended for

expenses paid by Propeller to be covered, they could have defined "Tenant" more broadly or written the contract to provide indemnification for Tenant and its parent company.

Georgia law forbids requiring the Airport Authority to indemnify a party it did not promise to indemnify. *See Boafo v. Hosp. Corp. of Am.*, 338 S.E.2d 477, 478 (Ga. Ct. App. 1985) (reasoning that certain transactions between a parent and subsidiary "do not alone or all together justify disregarding the separate corporate entity which the law has created"). In *Peara v. Atlanta Newspapers, Inc.*, 169 S.E.2d 670 (Ga. Ct. App. 1969), the Court of Appeals of Georgia confronted a claim for indemnification under a suretyship contract. The surety agreement guaranteed that the defendant would indemnify "World Wide Computer Training"—a division of Computer Services Corporation—for advertising credit extended to World Wide. *Id.* at 671. But when the plaintiff sought payment under the agreement for advertising credit extended to *Computer Services*, the defendant refused to pay. *Id.* The Court of Appeals held that the defendant "did not agree to indemnify for credit extended to Computer Services Corp.," even though Computer Services included the indemnitee, World Wide, as one of its divisions. *Id.*

Here, as in *Peara*, indemnity under Georgia law may not be enforced "by implication or interpretation." *Id.* Indeed, "under Georgia law, the words of a contract of indemnification must be construed strictly against the indemnitee and every presumption is against an intention to indemnify." *Firmani v. Dar-Court Builders,*

*LLC*, 793 S.E.2d 596, 605 (Ga. Ct. App. 2016) (alterations adopted) (quoting *Svc. Merchandise Co. v. Hunter Fan Co.*, 617 S.E.2d 235, 237–38 (Ga. Ct. App. 2005)).  Applying that rule of law, as we are *Erie*-bound to do with respect to Silver Comet's state law contract claims, it would be improper to infer that the indemnification provision is meant to cover expenses paid by anyone other than Silver Comet, especially considering that the contract could have (but did not) name anyone other than Silver Comet as the indemnitee.

If the parties intended for expenses initially paid by Propeller to be covered, they could have defined "Tenant" more broadly or written the contract to provide indemnification for Tenant and its parent company.  Such language is common and  we have addressed similar clauses in previous cases. *See, e.g., Nat'l R.R. Passenger Corp. (Amtrak) v. Rountree Transp. & Rigging, Inc.*, 422 F.3d 1275, 1284 (11th Cir. 2005) (analyzing an indemnification clause that guaranteed payment to, among others, "any *parent, subsidiary, or affiliated system companies* of [CSX]" (emphasis added)); *Yellow Pages Photos, Inc. v. YP, LLC*, 856 F. App'x 846, 855 (11th Cir. 2021) (discussing clause that required indemnification of a company "and its *parents, subsidiaries, and commonly owned or controlled affiliates* and their respective officers, directors and employees" (emphasis added) (other emphasis omitted)). But the parties did not strike such a bargain here.  Instead, the Authority agreed to indemnify only Silver Comet.

Silver Comet resists this plain-language-driven conclusion by arguing that the entity that cut the check to cover the expenses

is irrelevant, and what matters is that Silver Comet "incurred" the expenses from an accounting perspective. In support of this argument, Silver Comet cites Reichin's declaration, which states that "[w]hile checks were cut by Propeller Airports to pay expenses on behalf of Silver Comet Terminal Partners, those expenses and payments were properly allocated by journal entries to Silver Comet Terminal Partners." Silver Comet also cites an IRS Revenue Ruling, which interprets the tax code to allow subsidiaries to claim tax deductions for expenses paid by its parent on its behalf. *See* Rev. Rul. 84-68, 1984-19 I.R.B. 5, 1984-1 C.B. 31, 1984 WL 262636. From that IRS Revenue Ruling and other sources of federal law, Silver Comet discerns a "common-sense rule," under which a subsidiary incurs an expense even when its parent pays that expense. Silver Comet argues that because these expenses "belonged" to Silver Comet in an accounting sense, it can be indemnified for the amount of those expenses, even if there is no evidence that Silver Comet has ever or will ever part with any of its own money to cover the expenses.[6] *See Reeves v. Mohawk Factoring, Inc.*, 583

---

[6] At oral argument, Silver Comet's counsel contended that when Propeller paid Silver Comet's expenses "you are either going to have an inter-company loan or you are going to have a capital contribution" from Propeller to Silver Comet. When pressed, however, counsel conceded that there is no evidence in the record (such as a loan agreement, etc.) to that effect. *See* Oral Argument at 7:50–9:00. Thus, there is no evidence that Silver Comet is obliged to pay Propeller back for the money Propeller paid on its behalf.

S.E.2d 487, 488 (Ga. Ct. App. 2003) ("A subsidiary is generally considered under law to be a separate legal entity form its parent.").

The problem with this argument is that even if Silver Comet "incurred" the expenses as an accounting matter,[7] the Airport Use Agreement is at best ambiguous as to whether an expense incurred by Silver Comet but paid by another entity is subject to indemnification. Indeed, it is noteworthy that, although the indemnification provision holds Silver Comet "harmless from and against any and all … expense," it does not use either of the words "incur" or "paid." And given that lack of a clear contractual right to indemnification, Georgia law requires us to construe the indemnification provision narrowly and against indemnity. *See, e.g.*, *Peara*, 169 S.E.2d at 671; *Firmani*, 793 S.E.2d at 605.

Not only that, but the Airport Use Agreement contract also entitled Silver Comet to assign its lease and any interest thereunder, meaning that Silver Comet could have assigned its rights under the indemnity provision to Propeller. Had Silver Comet assigned its rights to Propeller, then "Tenant" (the party who, under the indemnity provision, "shall" be indemnified by the Airport

---

[7] The fact that Propeller, not Silver Comet, issued the 1099 tax forms for many of the expenses suggests that Propeller was the entity that "incurred" the expenses. *See* 26 C.F.R. § 1.6041-6(a) ("The name and address of the person making the payment and the name and address of the recipient of the payment shall be stated on Form 1099.").

Authority) would have included Propeller. But Silver Comet did not assign its rights to Propeller.

We therefore affirm the district court's entry of judgment on Silver Comet's claim that the Airport Authority breached the Airport Use Agreement's indemnification provision.

### b. Attorney's Fees

As an alternative ground for granting summary judgment on Silver Comet's claim under the indemnity provision, the district court found that the Airport Use Agreement did not require the Airport Authority to indemnify Silver Comet for its attorney's fees. We agree.

Under Georgia law, "[t]he general rule is that attorneys fees are not included in the term 'costs' or 'expenses' in the absence of some statutory provision, rule of court, or by contract of the parties." *Bowers v. Fulton County*, 183 S.E.2d 347, 348 (Ga. 1971).[8]

---

[8] Silver Comet points to cases where this Court, applying Georgia law, held that an indemnity provision encompassed legal fees based on the phrases "any and all loss, cost, damage and expense" and "all loss, damage, and expense." *Brown v. Seaboard Coast Line R.R. Co.*, 554 F.2d 1299, 1304 (5th Cir. 1977); *see also Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding that the decisions of the Former Fifth Circuit handed down before September 30, 1981, are binding precedent on the Eleventh Circuit). But the Georgia Court of Appeals has since rejected that interpretation, explaining that "it overlooked the long-standing Georgia rule that attorney fees cannot be recovered in the absence of an *express* contract provision" and that it instead turned on "a *federal* rule," under which courts interpret "indemnity

21-12906                Opinion of the Court                40

For that reason, an indemnitee may recover legal fees only when "the indemnity provision . . . expressly provide[s] for attorneys fees," *Doss & Assocs.*, 754 S.E.2d at 98 (citing *Bowers*, 183 S.E.2d at 348); *see also George L. Smith II Ga. World Cong. Ctr. Auth. v. Miller Brewing Co.*, 566 S.E.2d 361, 363 (Ga. Ct. App. 2002) (same). Here, the indemnity provision does not expressly provide for attorney's fees. So the Airport Authority need not indemnify Silver Comet for them.

Contending otherwise, Silver Comet points to an exception to the general rule that an indemnity provision does not provide for legal fees absent an express provision to the contrary. Under this "exception to" the "general rule against the recovery of attorney fees and costs[,] 'attorney fees and expenses of litigation in an underlying action *are* recoverable as real damages incurred as the result of defendants' malfeasance or misfeasance." *Etowah Env't Grp., LLC v. Walsh*, 774 S.E.2d 220, 228 (Ga. Ct. App. 2015) (quoting *Atlanta Woman's Club v. Washburne*, 450 S.E.2d 239, 241 (Ga. Ct. App. 1994)).[9]  This exception "permits a plaintiff to recover all

---

agreements broadly with regard to the type of damages recoverable." *Doss & Assocs. v. First Am. Title Ins. Co.*, 754 S.E.2d 85, 98 n.17 (Ga. Ct. App. 2013).

[9] The Airport Authority argues that Silver Comet failed to raise this argument in the district court. We disagree. Silver Comet raised a very similar argument in the district court, citing many of the same cases and statutes that it does on appeal.

losses flowing from a defendant's alleged misfeasance or malfeasance," *Id.*

Although Silver Comet invokes that exception here, it ignores that the exception applies only when the legal fees flow from the defendants' malfeasance or misfeasance. *But see, e.g.*, *Marcoux v. Fields*, 394 S.E.2d 361, 363 (Ga. Ct. App. 1990) (explaining that attorney's fees and expenses are recoverable as real damages "if they are the proximate result of" the "defendants' malfeasance or misfeasance." (citation omitted)). And Silver Comet has not pointed to malfeasance or misfeasance that caused its expenditure of attorney's fees and other legal expenses. As a result, Silver Comet has failed to establish that the exception applies.

We therefore apply the general rule and find that the indemnity provision did not require the Airport Authority to indemnify Silver Comet for its attorney's fees.

### c. Taxiway Expenses

The district court also found, in the alternative, that the Airport Use Agreement did not require the Airport Authority to indemnify Silver Comet for expenses paid in connection with a project that expanded the Airport's taxiway. The Airport Use Agreement's indemnity provision precedes a provision that discusses so-called "Improvement Payments." That provision states that Silver Comet had the "right, at its sole and absolute discretion, to pay for all the improvements . . . to Paulding Northwest Atlanta Airport necessary to obtain the [Part 139] Certification." The

improvement-payment provision supplies a mechanism for Silver Comet to seek reimbursement from the Airport Authority, making clear that improvement payments are separate and distinct from the expenses covered by the indemnity provision.

Before the district court, Silver Comet conceded that the "taxiway project was necessary to accommodate certain commercial passenger planes." Of course, a Part 139 certification is also necessary to accommodate commercial passenger service and Smith testified to this fact at his deposition. *See* 14 CFR § 139, *et seq.* So Silver Comet effectively conceded that the moneys it paid in connection with the taxiway project were improvement payments.

We therefore decline to disturb the district court's finding that the indemnity provision does not require the Airport Authority to indemnify Silver Comet for the moneys it spent in connection with the taxiway project.[10]

### iv. Termination of Airport Use Agreement

Silver Comet's final argument assigns error to the district court's finding that the Airport Authority could terminate the

---

[10] Silver Comet now argues that a separate agreement, called the Bond Agreement, superseded the Airport Use Agreement's indemnity and improvement-payment provisions with respect to Silver Comet's taxiway expansion expenses. Silver Comet did not make this argument before the district court. So we will not address it here. *See, e.g.*, *CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1336–37 (11th Cir. 2017).

Airport Use Agreement on December 7, 2018. As the district court explained, the Airport Authority was contractually entitled "to terminate the [Airport Use] Agreement if two conditions were met: (1) there was no commercial passenger service at the airport, and (2) [Silver Comet] had not exercised its option to lease the entire terminal building." There's no question that the first condition was met—that is, "commercial passenger service was not instituted at the Paulding County Airport." So the only issue the district court resolved was whether Silver Comet "in fact exercised its option to lease the building."

Under the Airport Use Agreement, Silver Comet's option to expand its lease to the entire terminal building was "exercisable by written notice to" the Airport Authority. The contract also provided that "the parties shall enter into an amendment" to reflect Silver Comet's expansion within fifteen business days after the Airport Authority receives Silver Comet's notice. Even though Silver Comet supplied the Airport Authority with notice of its *intent* to exercise that option, the district court found that Silver Comet did not exercise that option.

On appeal, Silver Comet argues that the district court's finding was erroneous because Silver Comet exercised its option to lease the entire building when it provided notice of its intent to exercise that option. "All that was required to exercise the option was written notice," avers Silver Comet. And, in its view, Silver Comet provided that written notice on June 29, 2018, when it sent a letter to the Airport Authority notifying it of Silver Comet's "intent to

exercise" its expansion rights under the Airport Use Agreement. "This exercise was memorialized in writing on September 5, 2018," Silver Comet adds, referencing a second letter, in which it asked the Airport Authority "to amend the Lease to reflect Silver Comet's exercise of its expansion option to lease the Terminal Building."

But the problem with this argument is that the Airport Authority repeatedly sought to "enter into an amendment" to memorialize Silver Comet's expansion, while Silver Comet did everything in its power to prevent the parties from "enter[ing] into an amendment" that reflected Silver Comet's expansion. After Silver Comet first notified the Airport Authority that it intended to exercise its expansion rights to occupy the entire terminal building, the Airport Authority responded, indicating its readiness to "enter into an amendment" to preserve Silver Comet's expansion rights, stating that it was prepared to vacate the entire building, and asking Silver Comet to forward its rent payment for the first month by September 1, 2018. But Silver Comet didn't respond until September 5, 2018.

And even then, Silver Comet did not pay the first month's rent. Instead, it asked the Airport Authority to "amend the Lease to reflect . . . Silver Comet's exercise of its expansion option to lease the Terminal Building." The Airport Authority again complied, providing Silver Comet with a draft lease less than two weeks later. Rather than signing that lease, Silver Comet asked the Airport Authority to send a new one with two changes. Again, the Airport

Authority complied and provided a new draft lease that incorporated Silver Comet's requested changes.

One of those changes pushed the amendment's effective date back from November 1, 2018, to December 1, 2018. But Silver Comet again asked the Airport Authority to place that effective date "on hold" after filing this lawsuit. That request proved too much when the Airport Authority rejected it and told Silver Comet that the Airport Authority would assume that Silver Comet did not intend to lease the terminal building unless the Airport Authority received "an executed lease and payment" before December 1, 2018. Silver Comet never sent the Airport Authority an executed lease or payment. So the Airport Authority then terminated the Airport Use Agreement on December 7, 2018.

Given all this back and forth, the district court construed Silver Comet's June 29 and September 5 letters as proving that Silver Comet "was not yet exercising the option, but rather that it only intended to do so at some point."

Resisting that conclusion, Silver Comet urges us to construe the contract in a way that would allow it to put the lease on hold while it decided whether to exercise its expansion rights without risking that the Airport Authority would exercise its termination right. Indeed, Silver Comet says that "[e]ntering into an amended lease was not" necessary for Silver Comet to exercise its expansion rights. Yet the contract explicitly says that "the parties shall enter into an amendment to his Lease" within "fifteen business days after [the Airport Authority's] receipt" of Silver Comet's notice to

expand its lease. And as we have explained, the Airport Authority tried at every step of the way to enter into an amended lease.

In sum, the Airport Use Agreement speaks in mandatory rather than permissive terms when it says that "the parties shall enter into an amendment" to reflect Silver Comet's expansion within fifteen business days after the Airport Authority receives Silver Comet's notice. And given that Silver Comet refused to enter into an amended lease with the Airport Authority, we agree with the district court "that while [Silver Comet] may have planned to go through with its exercise of the option at the time it sent the letter to the Airport Authority, it instead chose not to do so when it decided to put that decision on hold." Put simply, the Airport Use Agreement cannot be construed to permit Silver Comet to invoke its expansion rights while it decided whether to exercise those rights without risking that the Airport Authority would exercise its termination rights.

We therefore affirm the district court's entry of judgment against Silver Comet on its claim that the Airport Authority could not terminate the Airport Use Agreement.

### III. Conclusion

For these reasons, we affirm the district court's order granting summary judgment and its entry of judgment in the Airport Authority's favor.

**AFFIRMED.**

ROSENBAUM, Circuit Judge, Dissenting in Part:

Although I almost completely agree with the Majority Opinion, I split with it on the question of whether the indemnity provision covers expenses paid by Silver Comet's parent company, Propeller Airports. In my view, the indemnity provision is broad enough to cover expenses paid by Propeller.

The indemnity provision requires the Airport Authority to indemnify Silver Comet "against *any and all* . . . expense[s] *in connection with*" the Airport Authority's application for a Part 139 certification (emphasis added). Because the provision covers "any and all . . . expense[s]," it does not limit the expenses to direct ones. So expenses charged eventually to Silver Comet qualify as a kind of "any and all . . . expense[s]." Then the relevant question is whether a given expense was incurred "in connection with" the Airport Authority's application for a Part 139 certification. In other words, the mere fact that Propeller Airports initially paid an expense that Silver Comet eventually incurred does not, to my mind, disqualify the expense from indemnification under the broad language of the contract.

To be sure, I agree with the Majority Opinion that the indemnity provision covers neither Silver Comet's legal fees, nor the moneys Silver Comet spent in connection with the taxiway project. Maj. Op. at 39–43. But in addition to seeking indemnification for those expenses, Silver Comet also sought indemnification for things like salaries, overhead, office rent, and construction costs. The Airport Authority asks us to find that the indemnity provision

does not cover these expenses for a variety of reasons, none of which the district court addressed. "Because the district court did not address these issues," I would "decline to do so here in the first instance." *MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1306 (11th Cir. 2022). Instead, I would remand for the district court to determine whether the indemnity provision covers the remaining expenses for which Silver Comet seeks indemnification.

For these reasons, I would reverse the district court's order granting summary judgment insofar as it held that the Airport Authority need not indemnify Silver Comet for expenses connected to the Airport Authority's Part 139 certification simply because Silver Comet's parent company, Propeller Airports, paid for those expenses. I would remand the case to the district court with instructions to determine whether the indemnity provision covers the remaining expenses for which Silver Comet seeks indemnification. Because, in my view, the Majority Opinion incorrectly reaches the opposite conclusion, I respectfully dissent.